PD-0763-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/7/2015 4:21:21 PM
Accepted 7/9/2015 3:36:55 PM
ABEL ACOSTA
CLERK

**No. PD-0763-15**

IN THE

# COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

DONALD F. HUFF,
*Appellant-Respondent*

*v.*

STATE OF TEXAS,
*Appellee-Petitioner*

On the State's petition for discretionary review from
The Fourth Court of Appeals, San Antonio, Texas
Appellate Cause No. 04-13-00891-CR

Tried in the 226th Judicial District Court, Bexar County, Texas
Trial Cause No. 2011-CR-2990

## STATE'S PETITION FOR DISCRETIONARY REVIEW

NICHOLAS "NICO" LAHOOD
*Criminal District Attorney*
NATHAN E. MOREY
*Assistant Criminal District Attorney*
State Bar No. 24074756
CRIMINAL DISTRICT ATTORNEY'S OFFICE
Bexar County, Texas
101 West Nueva, Fifth Floor
San Antonio, Texas 78205
Voice: (210) 335-2360
Fax: (210) 335-2436
Email: nathan.morey@bexar.org
*Attorneys for the State of Texas*

FILED IN
COURT OF CRIMINAL APPEALS

July 9, 2015

ABEL ACOSTA, CLERK

## IDENTITY OF THE PARTIES AND COUNSEL

The parties to the suit are as follows:

Defendant/Appellant/Respondent
    **Donald F. Huff**

Counsel for Defendant/Appellant/Respondent
    **Dayna Jones** – counsel on appeal
    Attorney at Law
    San Antonio, Texas
    **Ronald "Rusty" Guyer** – counsel at trial
    **Justin Fischer** – counsel at trial
    Attorneys at Law
    San Antonio, Texas

State of Texas
    **Nathan E. Morey** – counsel on appeal and discretionary review
    **David Henderson** – counsel at trial
    **Charles "Chip" Rich** – counsel at trial
    **Eric Fuchs** – counsel at trail
    **Samantha DiMaio** – counsel at trial
    Assistant Criminal District Attorneys
    Bexar County, Texas

Trial Judges
    **Honorable Sid L. Harle**
    226th Judicial District Court
    Bexar County, Texas

Court of Appeals Panel
    **Honorable Sandee Bryan Marion, Chief Justice**
    **Honorable Karen Angelini, Justice**
    **Honorable Marialyn Barnard, Justice** (author of the opinion)
    Fourth Court of Appeals District of Texas
    San Antonio, Texas

## TABLE OF CONTENTS

IDENTITY OF THE PARTIES AND COUNSEL ................................................................ ii

TABLE OF CONTENTS ......................................................................................... iii

INDEX OF AUTHORITIES...................................................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ........................................................ vi

STATEMENT OF THE CASE .................................................................................. vi

STATEMENT OF PROCEDURAL HISTORY .................................................................. vii

GROUNDS FOR REVIEW ........................................................................................1

ARGUMENT ........................................................................................................2

**Ground One:**    Is a warrantless, nonconsensual search administered in compliance with Transportation Code section 724.012(b) reasonable under the Fourth Amendment? ........2

**Ground Two:**    Did the court of appeals use an incorrect legal standard to determine whether the search was supported by exigent circumstances? ...................................3

**Ground Three:**    If a warrantless search pursuant to Transportation Code section 724.012(b) violates the Fourth Amendment, does Code of Criminal Procedure article 38.23 require the suppression of evidence of the blood-alcohol concentration?................................6

PRAYER FOR RELIEF...........................................................................................10

CERTIFICATE OF SERVICE....................................................................................11

CERTIFICATE OF COMPLIANCE .............................................................................12

APPENDIX A: Court of Appeals' Opinion..............................................................A

APPENDIX B: Order Denying Rehearing ...............................................................B

# INDEX OF AUTHORITIES

**Statutes:**

TEX. CODE CRIM. PROC. art. 1.03......................................................................7

TEX. CODE CRIM. PROC. art. 1.26......................................................................7

TEX. CODE CRIM. PROC. art. 38.23(b)................................................................7

TEX. PENAL CODE § 19.02(b)(3) ...................................................................... vii

TEX. TRANSP. CODE § 724.012(b)................................................................... vi, 8

TEX. TRANSP. CODE § 724.064.......................................................................7, 8

**Cases:**

*Ashcroft v. al-Kidd*,
   131 S. Ct. 2074 (2011)................................................................................3, 5

*Aviles v. State*,
   385 S.W.3d 110 (Tex. App.—San Antonio 2012),
   *vacated by*, 134 S. Ct. 902 (2014) ..................................................................8

*Brinegar v. United States*,
   338 U.S. 160 (1949)........................................................................................4

*Devenpeck v. Alford*,
   543 U.S. 146 (2004)........................................................................................3

*Heien v. North Carolina*,
   135 S. Ct. 530 (2014)......................................................................................4

*Hill v. California*,
   401 U.S. 797 (1971).........................................................................................4

*Hudson v. Michigan*,
   547 U.S. 586 (2006).........................................................................................8

*Huff v. State*,
   No. 04-13-00891-CR, 2015 Tex. App. LEXIS 3401
   (Tex. App.—San Antonio Apr. 8, 2015, pet. filed)......................... viii, 2, 4, 5

*Illinois v. Krull*,
408 U.S. 340 (1987)..............................................................................7

*Kentucky v. King*,
131 S. Ct. 1849 (2011).........................................................................4

*Mincey v. Arizona*,
437 U.S. 385 (1978)..............................................................................4

*Missouri v. McNeely*,
133 S. Ct. 1552 (2013)................................................................ vi, 5

*Scott v. United States*,
436 U.S. 128 (1978)..............................................................................3

*State v. Mazuca*,
375 S.W.3d 294 (Tex. Crim. App. 2012) ...........................................8

*Whren v. United States*,
517 U.S. 806 (1996)..............................................................................3

*Wilson v. State*,
311 S.W.3d 452 (Tex. Crim. App. 2010) ...........................................7

## Rules:

TEX. R. APP. P.  6.3(a).........................................................................11

TEX. R. APP. P.  9.4(i)(3).....................................................................12

TEX. R. APP. P.  9.5(b).........................................................................11

TEX. R. APP. P. 66.3(b)..........................................................................9

TEX. R. APP. P. 66.3(d)..........................................................................9

TEX. R. APP. P. 66.3(f) ..........................................................................5

TEX. R. APP. P. 68.1 .............................................................................. ix

TEX. R. APP. P. 68.11 ...........................................................................11

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Now comes the State of Texas, by and through Nicholas "Nico" LaHood, Criminal District Attorney of Bexar County, Texas, and the undersigned assistant criminal district attorney, with the filing of the following petition for discretionary review.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has already heard argument in multiple cases involving what effect *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), has on section 724.012(b) of the Transportation Code. The undersigned counsel will be ready to present oral argument should this Court find oral argument necessary to the disposition of this petition for discretionary review.

## STATEMENT OF THE CASE

Donald Huff, hereinafter referred to as Appellant, was charged by indictment with the offense of murder for causing the death of Arlene Harding-Watts during the commission of a felony driving while intoxicated offense. Because Appellant refused to provide a specimen of breath or blood, the arresting officer ordered him to submit to a warrantless blood draw pursuant to Texas Transportation Code section 724.012(b). A subsequent analysis confirmed that Appellant was intoxicated and the results of that analysis were admitted over

objection during Appellant's trial. The trial court admitted the blood-alcohol analysis because the officer was following the law that was in effect at the time of Appellant's arrest. The Fourth Court of Appeals held that section 724.012(b) does not allow for a warrantless, nonconsensual blood draw absent exigent circumstances.

### STATEMENT OF PROCEDURAL HISTORY

#### *Proceedings in the Trial Court*

A grand jury indicted Appellant for the offense of murder during the course of driving while intoxicated with two prior convictions (C.R. at 5). *See* TEX. PENAL CODE § 19.02(b)(3). A jury convicted him and the trial court sentenced him to confinement for 45 years (VII R.R. at 102; VIII R.R. at 38). The trial court pronounced sentence on September 26, 2013 (VIII R.R. at 1, 38) and signed and entered a judgment of conviction on September 30, 2013 (C.R. at 110–11). Appellant filed a motion for new trial on October 25, 2013 (C.R. at 113) which the trial court denied on November 19, 2013 (C.R. at 292). Appellant timely filed a notice of appeal (C.R. at 88).

#### *Proceedings in the Court of Appeals*

On April 8, 2015, the Fourth Court of Appeals, in a published opinion, reversed Appellant's conviction and remanded the case back to the trial court for a new trial. *Huff v. State*, No. 04-13-00891-CR, 2015 Tex. App. LEXIS 3401 (Tex.

App.—San Antonio Apr. 8, 2015, pet. filed) (Appendix A). The court of appeals denied the State's motion for rehearing on May 1, 2015 (Appendix B). The State now petitions this Court to review that opinion and judgment. *See* TEX. R. APP. P. 68.1. This petition is timely filed on or before July 10, 2015.

## GROUNDS FOR REVIEW

**Ground One:**     Is a warrantless, nonconsensual search administered in compliance with Transportation Code section 724.012(b) reasonable under the Fourth Amendment?

**Ground Two:**     Did the court of appeals use an incorrect legal standard to determine whether the search was supported by exigent circumstances?

**Ground Three:**   If a warrantless search pursuant to Transportation Code section 724.012(b) violates the Fourth Amendment, does Code of Criminal Procedure article 38.23 require the suppression of evidence of the blood-alcohol concentration?

## ARGUMENT

The State asks this Court to retain this petition on its docket until it decides the merits of *Weems v. State*, No. PD-0635-14; *Douds v. State*, No. PD-0857-14; and *Cole v. State*, No. PD-0077-15. A determination of the issues raised in those cases will affect the three grounds raised in this petition. In the event any of those cases are decided favorably for the prosecution, the State asks that this Court either affirm Appellant's conviction or, if necessary, remand this case back to the court of appeals in light of the new decision or decisions.

**Ground One:** Is a warrantless, nonconsensual search administered in compliance with Transportation Code section 724.012(b) reasonable under the Fourth Amendment?

This Court has already granted at least three petitions raising this issue in the context of death or bodily injury resulting from accidents. *See Weems v. State*, No. PD-0635-14; *Douds v. State*, No. PD-0857-14; *Cole v. State*, No. PD-0077-15. The State only asks that the Court resolve this ground consistent with those petitions. If this Court determines that section 724.012(b) authorizes reasonable searches without a warrant, then the court of appeals should be reversed and the trial court's judgment of conviction should be affirmed because the compelled blood draw was the only reversible error identified by the court of appeals. *Huff*, at *36.

2

**Ground Two:** Did the court of appeals use an incorrect legal standard to determine whether the search was supported by exigent circumstances?

The court of appeals did not correctly analyze whether the blood draw was supported by exigent circumstances. The State asks this Court to remand this case back to the court of appeals for a second analysis for the following reasons: (1) the court of appeals (and the trial court) relied almost exclusively on the officer's subjective intent; (2) the court of appeals misread *McNeely*'s holding; and (3) the court of appeals should have the benefit of this court's opinion or opinions in *Weems*, *Douds*, or *Cole*, *supra*, once they are decided.

### The Officer's Subjective Intent

It is axiomatic that the subjective intent of the officer is irrelevant to the lawfulness of a search or seizure. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011); *Devenpeck v. Alford*, 543 U.S. 146, 154–55 (2004); *Bond v. United States*, 529 U.S. 334, 339 n.2 (2000); *Whren v. United States*, 517 U.S. 806, 813 (1996). A court must decide whether "the circumstances, viewed objectively, justify the challenged action." *Ashcroft*, 131 S. Ct. at 2080 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978) (alterations omitted)). Consistent with this principle, the Supreme Court has stated that police may conduct a warrantless search "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is *objectively reasonable* under the Fourth Amendment."

3

*Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (emphasis added, internal quotes and alterations omitted)).

Along this same line is the equally axiomatic rule that an officer does not have to be *right* so long as he is *reasonable*. *See Hill v. California*, 401 U.S. 797, 804 (1971) (officer's factual mistake was reasonable and did not invalidate search and seizure). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

In this case, the court of appeals identified several factors relevant to an exigency analysis such as a major car accident involving the airlift of the victim, the need for the responding officer to block traffic, and Appellant being transported to the hospital for medical care before a blood sample could be obtained. *Huff*, at *2–4. However, the court of appeals did not discuss any of these facts when deciding whether exigent circumstances authorized the search. *Id.* at *29–32. Instead, the court of appeals (and the trial court) rested its opinion on the officer's conclusory response to Appellant's yes-or-no question: "Were there any exigent circumstances that prevented you from getting a warrant?" "No, sir." (V R.R. at 19). Because the officer's subjective intent is irrelevant, the court of appeals

4

should not be permitted to resolve the question of exigency on such a conclusory statement. Instead, it must ask if whether "the circumstances, viewed objectively, justify the challenged action." *Ashcroft*, 131 S. Ct. at 2080. This Court should remand this case because the court of appeals has "departed from the accepted and usual course of judicial proceedings" by relying on an officer's subjective intent in deciding a Fourth Amendment question. TEX. R. APP. P. 66.3(f).

**Misreading of *McNeely*'s Exigency Holding**

The court of appeals (and the trial court) concluded that there were no exigent circumstances because "the officer never thought of obtaining a warrant because it was not standard procedure." *Huff*, at *31. This conclusion is inconsistent with *McNeely's* holding. *McNeely* did not articulate when exigent circumstances exist, rather, the holding merely states that dissipation of alcohol from the blood alone does not create a per se exigency. *McNeely*, 133 S. Ct. at 1568. The question, according to *McNeely*, is not whether the officer can obtain a warrant. The question is whether police can obtain a warrant "without significantly undermining the efficacy of the search." *Id.* at 1561.

The court of appeals (and the trial court) only answered the first question. *Huff*, at *31. However, there is no analysis concerning whether obtaining a warrant would have undermined the efficacy of the search. In the present case, the arresting officer followed Appellant to the hospital, but was not able to speak with

him and ask him for a consensual blood test until 10:53 PM—nearly three hours after the initial crash (V R.R. at 12–15). The blood was ultimately drawn pursuant to the mandatory law at 11:36 PM (V R.R. at 15). Simply saying that he *could* have obtained a warrant is not a sufficient answer to *McNeely*'s question. The court of appeals' exigency determination is at odds with *McNeely* and this case should be remanded for a proper exigency analysis.

### Pending Cases before This Court

As with the first ground, there are pending cases before this Court that will provide more guidance as to how a court analyzes exigent circumstances in the context of a DWI-related car crash. *See Weems*; *Douds*; *Cole*, *supra*. The State asks this Court to retain this case on its docket until those cases are decided and then remand this case to the court of appeals so that it has the benefit of those decisions.


**Ground Three:**    If a warrantless search pursuant to Transportation Code section 724.012(b) violates the Fourth Amendment, does Code of Criminal Procedure article 38.23 require the suppression of evidence of the blood-alcohol concentration?

This Court recently granted a similar ground in *Cole v. State*, No. PD-0077-015. The State asks this Court retain this case until it decides *Cole* so that the State may have the benefit of that opinion.

Had he been tried in another state, Appellant would not have been able to invoke the federal exclusionary rule. The Supreme Court has declined to extend the protections of the federal exclusionary rule to those who are subjected to searches pursuant to statutes later found unconstitutional. *Illinois v. Krull*, 408 U.S. 340, 359–60 (1987). Article 38.23 contains one express exception relating to the objective good faith reliance upon a warrant. *Id.* at art. 38.23(b). Article 38.23 also advances the same purpose as the federal exclusionary rule—to "deter unlawful actions which violate the rights of criminal suspects in the acquisition of evidence for prosecution." *Wilson v. State*, 311 S.W.3d 452, 459 (Tex. Crim. App. 2010). The interpretation of article 38.23 is not a question of constitutional law, but of statutory construction. The legislature has provided some guidance.

The purpose of the Code of Criminal Procedure, which houses article 38.23, is to "adopt measures for preventing the commission of crime" and to "bring to the investigation of each offense on the trial all the evidence tending to produce conviction or acquittal." *Id.* at art. 1.03(1) & (4). The Code is to "be liberally construed, so as to attain the objects intended by the legislature: The prevention, suppression and punishment of crime." *Id.* at art. 1.26. The legislature has also expressly indicated that breath and blood evidence taken pursuant to the implied consent law is admissible in criminal proceedings. TEX. TRANSP. CODE § 724.064.

7

It is undisputed that the exclusion of probative evidence has historically been, and should continue to be, a trial court's "last resort" and not its "first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The Court of Criminal Appeals has echoed the Supreme Court's sentiments when interpreting article 38.23, the statutory exclusionary rule. *See State v. Mazuca*, 375 S.W.3d 294, 300 (Tex. Crim. App. 2012) (quoting and agreeing with *Hudson*'s "last resort" / "first impulse" paradigm).

The court of appeals concluded that "[t]he mandatory blood draw statute does not provide for a warrantless search." *Huff*, at *32. This is simply wrong. Until *McNeely*, virtually every officer in this state believed that the statute dispensed with warrant in those cases enumerated under subsection 724.012(b). This widely-held belief is evidenced by the sheer number of appeals currently before this Court. And prior to *McNeely*, at least one court of appeals agreed. *See Aviles v. State*, 385 S.W.3d 110 (Tex. App.—San Antonio 2012), *vacated by*, 134 S. Ct. 902 (2014).

In 2009 when this offense was committed, the Transportation Code commanded the officer to order a blood draw. TEX. TRANSP. CODE § 724.012(b). The Transportation Code also expressly designated evidence from the blood draw as admissible in a DWI related prosecution. *Id.* at § 724.064. The officer and the trial court were following the law by ordering the blood draw and the evidence

admitted. A "liberal construction" of article 38.23 should not incentivize a police officer to disregard one law because of some *unperceived* uncertainty regarding another law. A "liberal construction" of article 38.23 should allow police to follow the law as it is at the time of the investigation and not guess what it might be in the future.

In light of the instructions in articles 1.03 and 1.26 and the well-recognized purpose of the state and federal exclusionary rules, and in light of the pending decision in *Cole*, the State asks this Court to dispose of this ground in a matter consistent with *Cole*. *See* TEX. R. APP. P. 66.3(b) & (d).

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellee-Petitioner State prays the Court hold this petition until it decides the merits of *Weems*, *Douds*, and *Cole* and then affirm the conviction or, if necessary, remand the case back to the court of appeals in light of those decisions.

Respectfully submitted,

NICHOLAS "NICO" LAHOOD
*Criminal District Attorney*
Bexar County, Texas

/s/ *Nathan E. Morey*

NATHAN E. MOREY
*Assistant Criminal District Attorney*
State Bar No. 24074756
101 West Nueva, Fifth Floor
San Antonio, Texas 78205
Voice: (210) 335-2360
Fax: (210) 335-2436
Email: nathan.morey@bexar.org
*Attorneys for the State of Texas*

## CERTIFICATE OF SERVICE

I, Nathan E. Morey, assistant district attorney for Bexar County, Texas, certify that a copy of the foregoing petition has been delivered by email to Dayna Jones and the Office of the State Prosecuting Attorney on July 7, 2015 in accordance with Rules 6.3(a), 9.5(b), and 68.11 of the Texas Rules of Appellate Procedure.

/s/ *Nathan E. Morey*

NATHAN E. MOREY
*Assistant Criminal District Attorney*
State Bar No. 24074756
101 West Nueva, Fifth Floor
San Antonio, Texas 78205
Voice: (210) 335-2360
Fax: (210) 335-2436
Email: nathan.morey@bexar.org
*Attorney for the State of Texas*

cc: DAYNA L. JONES
*Attorney at Law*
State Bar No. 24049450
1800 McCullough Avenue
San Antonio, Texas 78212
Voice: (210) 255-8525
Fax: (210) 223-3248
Email: daynaj33@gmail.com
*Attorney for Appellant-Respondent*

LISA MCMINN
*State Prosecuting Attorney*
State Bar No. 13803300
P.O.Box 13046
Austin, Texas 78711
Email: Lisa.McMinn@SPA.texas.gov

## CERTIFICATE OF COMPLIANCE

I, Nathan E. Morey, certify that, pursuant to Texas Rules of Appellate Procedure 9.4(i)(2)(D) and 9.4(i)(3), the above petition for discretionary review contains 3,281 words according to the "word count" feature of Microsoft Office.

/s/ *Nathan E. Morey*

NATHAN E. MOREY
*Assistant Criminal District Attorney*
State Bar No. 24074756
101 West Nueva, Fifth Floor
San Antonio, Texas 78205
Voice: (210) 335-2360
Fax: (210) 335-2436
Email: nathan.morey@bexar.org
*Attorney for the State of Texas*

**APPENDIX A: Court of Appeals' Opinion**

**APPENDIX B: Order Denying Rehearing**



# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-13-00891-CR

Donald F. **HUFF**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2011CR2990
Honorable Sid L. Harle, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed:  April 8, 2015

REVERSED AND REMANDED

A jury convicted appellant Donald F. Huff of felony murder — the underlying offense was driving while intoxicated, third offense, and the trial court sentenced Huff to forty-five years' confinement.  On appeal, Huff raises four issues, contending: (1) the evidence is insufficient to support his conviction; (2) the trial court erred in denying his request for a dismissal based on a violation of the Interstate Agreement on Detainers Act ("IADA"); (3) the trial court erred in denying him the right to a speedy trial; and (4) the trial court erred in denying his motion to suppress.  We reverse and remand for a new trial.

**BACKGROUND**

The record shows that on August 6, 2009, EMTs were dispatched to a motorcycle accident in Bexar County, Texas. EMT Kevin Norman described the accident as "severe" and "bad." When he arrived, he saw a woman on the ground; she was lying near some kind of bent road sign. He noted that a man was "trying to drag the female individual and put her back on — back on the motorcycle again." Norman identified the man as Huff. The woman was ultimately identified as Arlene Harding-Watts. EMT Norman told Huff they would take over. Huff seemed uninjured, so the EMTs turned their attention to Harding-Watts. They determined her condition was serious enough to warrant Airlife, and she was airlifted to the hospital. Harding-Watts ultimately died from her injuries. A doctor from the Bexar County Medical Examiner's Office testified she died from "multiple blunt force injuries," including an injury to the spinal cord and liver.

EMT Norman testified that although he could not say with certainty, he believed Huff told him at the accident scene that he was driving the motorcycle at the time of the accident. Norman's belief was based on the notes he made for his report, which were made "some time between when we started treating Mr. Huff to the time we got to the hospital." He explained that once he is at the hospital, he normally has twenty to thirty minutes to finish his report. He wrote in his notes that Huff was driving approximately thirty miles per hour and lost control of the motorcycle. Norman stated he would not have written in his report that Huff was the driver unless Huff gave him that information. Norman also wrote in his report that Huff denied using drugs or alcohol before the accident.

After the testimony from the EMT, the State called San Antonio Police Officer Alfonso Peeler to the stand. Officer Peeler testified he was dispatched to the motorcycle accident involving Huff and Harding-Watts. After blocking off the intersection where the accident occurred, Officer Peeler was instructed by his sergeant to "to do the HGN and handle the DWI portion of the

accident." When he walked toward the actual accident site, he saw Harding-Watts lying on the ground. He described her condition as "horrific," stating "her foot was almost amputated . . . bone was sticking out through the leg." The officer stated EMTs were attending to Harding-Watts; his primary focus was Huff. At this point in his testimony, Officer Peeler identified Huff in the courtroom.

Officer Peeler testified that when he approached Huff at the scene, he was "shuffling around next to the curb." According to the officer, Huff was hesitant, slow, and appeared "impaired." The officer smelled a "faint odor of intoxicants" on Huff's breath and person. Officer Peeler specifically testified Huff told him he lost control of the motorcycle while driving himself and Harding-Watts home from a hair salon. Huff stated several times that he was the driver and lost control of the motorcycle; he was repeating himself. The officer included in his report Huff's admission that he was the driver.

The officer performed the HGN (horizontal gaze nystagmus) test on Huff. According to the officer, Huff showed six clues, indicating he was impaired. Huff declined to take any other portion of the field sobriety test, asserting his back was hurting. Officer Peeler opined that Huff was "impaired," i.e., "intoxicated." The officer testified that based on his observations at the accident scene, the accident occurred, in part, because Huff was intoxicated.

The EMTs inserted an IV line and took Huff to the hospital by ambulance as a precaution. At the hospital, Officer Peeler asked Huff if he would voluntarily provide a blood sample. When Huff declined, the officer advised Huff that he was going to take a blood sample. At the officer's direction — without consent or a warrant — a nurse took a blood sample from Huff. The blood sample was tested by the toxicology laboratory of the Bexar Medical Examiner's Office. At trial, the chief toxicologist, Veronica Hargrove testified, over objection, that Huff's blood sample had a blood alcohol concentration of 0.17 grams per deciliter, more than twice the legal limit of 0.08.

She also testified that a subject will show signs of impairment from alcohol consumption at 0.05 grams per deciliter. The toxicology report showing Huff's blood alcohol level was admitted into evidence over objection. On cross-examination, Chief Hargrove admitted Huff's blood alcohol level could have been higher or lower at the time of the accident, which occurred more than three hours before the blood draw. However, on redirect, she stated that given the elimination rate of alcohol from the body, it was unlikely Huff's blood alcohol content was less than 0.08 at the time of the accident.

Detective Carlos Reyes, a member of the traffic investigation unit at the time of the accident, testified that as an accident investigator he is called upon to determine how an accident occurred, whether it could have been avoided, and who bore responsibility for the accident, if there was fault. Detective Reyes testified he reviewed all of the reports prepared by the EMTs and the officers at the scene. He stated, based upon his review, he found no reason to believe Huff was not the driver of the motorcycle at the time of the accident. The detective opined that based on his investigation, he believed Huff was driving at the time of the accident, the motorcycle was traveling approximately thirty or forty miles per hour, and because of intoxication, "[Huff] failed to make the turn and he dropped the bike." Detective Reyes acknowledged on cross examination, however, that his opinion that Huff was the driver was based upon what other officers told him and their reports. He admitted he could not say who was driving at the time of the accident based on personal knowledge.

The State next presented testimony from Sergeant Scott Foulke, who is assigned to the traffic investigation division. He testified he spent two years as a motorcycle officer before he was promoted to sergeant. In order to become a motorcycle officer, he had to attend basic and advanced schools. Moreover, Sergeant Foulke testified that in his personal life, he had been legally riding motorcycles since the age of fourteen.

Although Sergeant Foulke admitted he knew a "little bit . . . but not a lot" about Harley Davidson motorcycles, which was the type of motorcycle at issue, as a motorcycle officer, he drove a "big road bike," a Honda Goldwing. He testified he was familiar with Harley Davidson "basic models, horsepower, weights and things of that nature." Looking at a picture of the motorcycle involved in the accident, Sergeant Foulke stated it would be a "little more difficult for the passenger" to get off of the motorcycle while it was in motion because of the back rest. The passenger would have to "clear" the back rest and the driver to dismount. He also testified that when you learn to ride a motorcycle, you are taught that when a motorcycle is "going down," you should "push yourself away from the bike, get away from the bike, curl up into a ball and roll to reduce the injuries and the road rash and things of that nature." Sergeant Foulke testified that an experienced driver could escape essentially unharmed from a motorcycle crash. He stated he had crashed, even flipped a motorcycle over, without suffering an injury.

An investigator with the Bexar County District Attorney's Office, Albert Lary, testified that at the prosecutor's request, he pulled records from the Department of Motor Vehicles, part of the Texas Department of Transportation, regarding ownership of the motorcycle involved in the accident. The records, which were admitted into evidence, established Huff was the registered owner of the motorcycle. Investigator Lary also testified Huff had a standard driver's license with a motorcycle endorsement. Harding-Watts had a standard driver's license as well, but she did not have a motorcycle endorsement.

The defense called three witnesses to testify. The first was a private investigator, James McKay, who was hired by the defense to take photographs and distance measurements at the accident scene. Mr. McKay authenticated several photographs and testified regarding certain distances along the road where the accident occurred.

The defense then called John Monaco to testify.  Mr. Monaco testified he worked at a gas station/convenience store in 2009 — the year of the accident.  While working at the convenience store, he met Huff.  Mr. Monaco described Huff as a regular customer who came in "every day."  He saw Huff driving a motorcycle and sometimes saw a woman with him.  Mr. Monaco said he met the woman, but could not recall her name.  Mr. Monaco testified he remembered "many, many times that the woman was driving the motorcycle and Mr. Huff was just on the back smiling."  He said that generally when the couple came to the store together, the woman was driving the motorcycle.  He identified the woman he saw driving the motorcycle as Harding-Watts.

The defense also called a friend of Huff's, Joseph J. Schubach Jr., who testified that in August 2009, around 7:00 p.m., he was entering Nacogdoches Road — the road where the accident occurred — and saw Huff with a woman who resembled a woman Huff had previously introduced to him.  He said the couple was riding a motorcycle — the woman was driving and Huff was riding on the back.  Schubach testified he noticed because he thought it was "weird" that a woman was driving and Huff was on the back.  That same night, he saw a news report about an accident, but admitted he "really didn't pay much attention to it."  Then, four or five days later, Huff came to his house and told him there was a motorcycle accident and Huff's "lady friend" had been killed.  Schubach admitted he could not remember the date he saw Huff and the woman on the motorcycle.

After hearing arguments and receiving the court's jury charge, the jury retired to deliberate.  Ultimately, the jury found Huff guilty of murder.  The murder conviction was based on the commission of a felony — third offense DWI — resulting in the death of Harding-Watts.  The trial court sentenced Huff to forty-five years' confinement.  Huff perfected this appeal.

## ANALYSIS

As noted above, Huff raises four issues on appeal.  He contends: (1) there is insufficient evidence to support his murder conviction; (2) the trial court should have granted his request for a

dismissal under the IADA; (3) he was denied his right to a speedy trial; and (4) the trial court should have granted his motion to suppress.

## *Sufficiency of the Evidence*

Huff argues the evidence is insufficient to support his murder conviction because there is no evidence he was the one operating the motorcycle at the time of the accident that resulted in the death of Harding-Watts. More specifically, Huff argues the *corpus delicti* rule prohibits his conviction because the statements he allegedly made — that he was operating the motorcycle at the time of the accident — were uncorroborated and there is no other evidence to support the State's assertion that he was operating the motorcycle.

### *Standard of Review*

In reviewing the legal sufficiency of the evidence to support a conviction, we must view all of the evidence in the light most favorable to the jury's verdict, keeping in mind that it is the province of the jury "to resolve all contested issues of fact and credibility." *Delay v. State*, 443 S.W.3d 909, 912 (Tex. Crim. App. 2014). We must determine whether any rational trier of fact could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In circumstances where the record supports conflicting inferences, we must presume the factfinder resolved any conflicts in favor of the verdict and defer to that determination. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *see Jackson*, 443 U.S. at 318. This presumption includes conflicting inferences from circumstantial evidence. *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Moreover, we may not substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

*Application*

A person commits the offense of felony murder by committing a felony — other than manslaughter — and in furtherance of the commission of the offense, he commits an act clearly dangerous to human life that causes the death of another. TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011). The Court of Criminal Appeals has held that felony DWI can be the underlying felony in a felony murder prosecution under section 19.02(b)(3). *Lomax v. State*, 233 S.W.3d 302, 303 (Tex. Crim. App. 2007); *Sandoval v. State*, 310 S.W.3d 73, 75 (Tex. App.—El Paso 2010, pet. ref'd). A person commits felony DWI by operating a motor vehicle in a public place while intoxicated after having been previously convicted twice for the same offense. TEX. PENAL CODE ANN. §§ 49.04(a), 49.09(b)(2).

In this case, Huff does not dispute that he was intoxicated, that he was twice previously convicted of DWI, or that the accident resulted in the death of Harding-Watts. Rather, he only challenges the evidence relating to the State's assertion that *he* was the person operating the motorcycle at the time of the incident. It is clear that Huff is suggesting that but for his statements to first responders, the evidence supports the conclusion that it is just as likely Harding-Watts was operating the motorcycle at the time of the accident. After all, he presented evidence from two witnesses that she often drove the motorcycle when they were riding together, and one witness suggested he might have seen her operating the motorcycle just before the accident.

Huff relies upon the *corpus delecti* rule. The rule, which dates back to at least the 17th century, is a common law, judicially-created doctrine. *Carrizales v. State*, 414 S.W.3d 737, 740 (Tex. Crim. App. 2013). The rule's original purpose was to make certain a defendant was not convicted based solely on his own false confession, thereby countering the belief in some quarters that a defendant would not confess unless he was guilty. *Id.* at 741. The rule has survived under Texas law, and in Texas, a defendant's extrajudicial confession does not constitute legally

sufficient evidence unless there is independent evidence he committed the offense. *Id.* at 743. However, the rule is satisfied "if some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows the crime actually occurred." *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002).

We disagree with Huff's assertion that the *corpus delecti* rule prohibits his conviction, i.e., the evidence is legally insufficient to establish he was operating the motorcycle. In addition to Huff's admissions to EMT Norman and Officer Peeler that he was operating the motorcycle at the time of the accident, EMT Norman testified that he wrote in his report that Huff was driving approximately thirty miles per hour at the time of the crash. EMT Norman specifically stated he would not have put this information in his report unless Huff had made the statement. Detective Reyes, who investigated the incident, calculated the motorcycle was traveling at approximately thirty to forty miles an hour at the time of the crash, corroborating the speed as relayed to the EMT by Huff. Investigator Lary testified Huff was the registered owner of the motorcycle and had a motorcycle endorsement on his driver's license. According to Investigator Lary, Harding-Watts had no such endorsement. The State also presented evidence from Sergeant Foulke, an experienced motorcycle rider, who testified it would have been more difficult for the motorcycle passenger to dismount the motorcycle, but an experienced driver could escape uninjured from a motorcycle crash. The evidence showed that although Harding-Watts's injuries were horrific, resulting in her death, Huff was relatively uninjured. Finally, the jury was aware that Huff had two prior convictions for DWI.

Given the evidence set forth above, we hold there is evidence outside of Huff's extrajudicial confession to establish he was operating the motorcycle at the time of the crash. Accordingly, the *corpus delecti* rule was satisfied. *See Salazar*, 86 S.W.3d at 645; *see also Gonzales v. State*, 190 S.W.3d 125, 131 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (holding

that corroborating evidence need not prove underlying offense conclusively); *cf. Layland v. State*, 144 S.W.3d 647, 651 (Tex. App.—Beaumont 2004, no pet.) (holding that corpus delecti of DWI is that someone operated motor vehicle in public place while intoxicated). Based on satisfaction of the *corpus delecti* rule, the nature of Huff's complaint, and the applicable standard of review, we further hold the evidence was sufficient to support the felony murder conviction.

### *Dismissal Under the IADA*

We next address Huff's contention that the trial court erred in denying his request for a dismissal based on a violation of the IADA. Huff claims that contrary to the State's position, he complied with all IADA requirements, mandating a dismissal.

### *Standard of Review*

Whether a trial court erred in refusing to grant a motion to dismiss with regard to an untried indictment, information, or complaint under the IADA is a question of law, and therefore, is subject to de novo review. *State v. Miles*, 101 S.W.3d 180, 183 (Tex. App.—Dallas 2003, no pet.); *Espinoza v. State*, 949 S.W.2d 10, 11 (Tex. App.—San Antonio 1997, pet. ref'd). However, the factual findings underlying the trial court's decision are reviewed under the clearly erroneous standard. *Miles*, 101 S.W.3d at 183; *Espinoza*, 949 S.W.2d at 11. Thus, we will conduct a de novo review concerning whether Huff complied with the requirements of the IADA, but we will use the "highly deferential clearly-erroneous standard" with regard to our review of the factual findings underlying the trial court's decision to deny Huff's motion. *See State v. Chestnut*, 424 S.W.3d 213, 216 (Tex. App.—Texarkana 2014, no pet.); *see generally Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012) (holding, in context of *Batson* challenge, that clearly erroneous standard is highly deferential and appellate court must defer to trial court's ruling in absence of exceptional circumstances).

*Application*

Texas has adopted the IADA, which is "a congressionally sanctioned compact between the United States and the states that have adopted it."[1] *Chesnut*, 424 S.W.3d at 214 (citing *Alabama v. Bozeman*, 533 U.S. 146, 148 (2001)); *see* TEX. CODE CRIM. PROC. ANN. art. 51.14 (West 2006). The IADA was enacted and adopted by the member states because prior to its enactment and adoption, it was difficult for a state to proceed with charges against an individual who was already incarcerated in another state. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. I. The IADA sought "to encourage the expeditious and orderly disposition" of pending charges, as well as resolving pending detainers.[2] *Id.* In an effort to accomplish these goals, the IADA sets out the "cooperative" procedures to be used when one state desires to try a defendant, who is currently incarcerated in a penal or correctional institution of another state. *Id.*; *State v. Votta*, 299 S.W.3d 130, 134–35 (Tex. Crim. App. 2009). It also permits a prisoner, against whom a detainer has been filed, to demand a speedy disposition of the charges giving rise to the detainer. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III. It is Article III that is at issue in this case.

The prosecuting authority seeking to try an individual who is incarcerated in another state's institution, must file a detainer with the institution in the state where the individual is being held. *Id.* art. 51.14, Art. III(a); *Votta*, 299 S.W.3d at 135. Once the detainer is filed, the warden or other official who has custody of the prisoner must "promptly" inform the prisoner that a detainer has been filed against him and that he has the right to request a final disposition of the pending charges upon which the detainer is based — this is where the right to a speedy disposition begins. TEX.

---

[1] The term "State," as used in the IADA refers to a state of the United States, the United States, a territory or possession of the United States, the District of Columbia, and the Commonwealth of Puerto Rico. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. II(a).

[2] A "detainer" "is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking that the prisoner be held for the agency, or that the agency be advised when the prisoner's release is imminent." *Fex v. Michigan*, 507 U.S. 43, 44 (1993).

CODE CRIM. PROC. ANN. art. 51.14, Art. III(c); *Votta*, 299 S.W.3d at 135. To request a final and speedy disposition, the prisoner must give or send the warden or other official with custody over him a "written notice of the place of his imprisonment and his request for final disposition." TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(a), (b); *Votta*, 299 S.W.3d at 135. The prisoner must include with his request "a certificate" containing specific information about his current incarceration, e.g., term of commitment, time served, time remaining to be served, good time earned, date of parole eligibility, and any decision of the state parole agency. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(a); *Votta*, 299 S.W.3d at 135. The warden or other official with custody over the prisoner must "promptly forward" the notice, request, and certificate to the proper prosecuting authority and the court by registered or certified mail, return receipt requested. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(b); *Votta*, 299 S.W.3d at 135. If the prisoner complies with all the requirements in article 5l.14, he must be brought to trial in the state where charges are pending "within 180 days from the date on which the prosecuting officer and the appropriate court receive" the written request, unless a continuance is granted. *Votta*, 299 S.W.3d at 135 (citing TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(a)). If the prisoner has complied with the statutory requirements and is not brought to trial within 180 days, the trial court must dismiss the pending charges with prejudice. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(d); *Votta*, 299 S.W.3d at 135.

Huff was indicted for the offenses of felony murder, intoxication manslaughter, manslaughter, and felony driving while intoxicated on April 11, 2011. Huff posted bond and was released. On September 14, 2011, while he was free on bond, Huff surrendered himself to federal authorities pursuant to an arrest warrant relating to a violation of probation. Huff was confined in a federal correctional institution in Bastrop, Texas. The federal institution received a letter from the Bexar County Sheriff's Office advising the institution of the charges pending against Huff in

Bexar County — murder and DWI, third offense. On January 30, 2012, the Department of Justice/Federal Bureau of Prisons issued a Detainer Action Letter addressed to the Bexar County Sheriff's Office. The document stated that a detainer had been filed against Huff "in your favor," and advised that Huff's release was tentatively scheduled for August 15, 2013. On February 3, 2012, Huff received the Detainer Action Letter, as well as a document entitled "Agreement of Detainers Notice of Untried Indictment, Information or Complaint and Right to Request Disposition." The notice advised Huff of the pending charges and that he had the right to request a final disposition of the pending Bexar County charges and that if he desired to do so, he was to "notify the Supervisory Correctional Systems Specialist" in the institution where he was being held.

On March 27, 2012, Huff's attorney filed a "Motion for Speedy Trial" with the Bexar County District Clerk. In the motion, Huff demanded a speedy trial pursuant section article 51.14 of the Code of Criminal Procedure, i.e., the IADA. Included in the motion was Huff's "United States Marshal[']s Number" and the name and mailing address of the federal facility. Attached to the motion was the "Detainer Action Letter" and the "Agreement of Detainers Notice of Untried Indictment, Information or Complaint and Right to Request Disposition." The second document was the notice provided to Huff. The motion was signed by Huff's attorney and delivered to "the Bexar County District Attorney's Office, San Antonio, Texas," according to the certificate of service.

Thereafter, on January 7, 2013, Huff filed his "Motion to Dismiss for Denial of Speedy Trial." In the motion, Huff claimed he was entitled to a dismissal of the Bexar County charges because he had not been brought to trial within 180 days of the date he demanded a speedy trial, i.e., March 27, 2012. In response, the State requested temporary custody of Huff pursuant to the IADA. With Huff present, the trial court held a hearing on the motion to dismiss. At the hearing,

an employee at the federal institution where Huff was confined — the supervisor of the records office — testified Huff was apprised of his rights under the IADA, but the institution had no evidence that Huff ever requested a final disposition under the IADA. She also testified inmates are provided a handbook that advises them how to make requests under the IADA

It is undisputed that Huff was not brought to trial within 180 days of the date his attorney filed the "Motion for Speedy Trial." Thus, Huff contends he was entitled to a dismissal with prejudice of the charges relating to the motorcycle accident. *See* TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(d). The State contends Huff was not entitled to a dismissal because he did not comply with the mandates of article 51.14. Specifically, the State contends Huff did not provide the warden or other official with custody over him a "written notice of the place of his imprisonment and his request for final disposition." *Id.* art. 51.14, Art. III(a), (b); *Votta*, 299 S.W.3d at 135. Rather, Huff's attorney simply filed a "Motion for Speedy Trial." The State further contends that even if Huff's attorney could make the request for final disposition on Huff's behalf via a motion for speedy trial, Huff's attorney failed to: (1) attach the statutorily mandated "certificate," which must contain Huff's term of commitment, time served, time remaining to be served, good time earned, date of parole eligibility, and any decision of the state parole agency; and (2) forward the certificate to the proper prosecuting authority and the court by registered or certified mail, return receipt requested. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(a), (b); *Votta*, 299 S.W.3d at 135. Indeed, Huff's counsel did not attached the required certificate to the motion. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(a); *Votta*, 299 S.W.3d at 135. Rather, the motion merely contains information regarding Huff's federal identification number and the facility in which he is incarcerated. The certificate was provided to the State only after it requested custody of Huff for purposes of the dismissal hearing. And, the motion's certificate of service bears a district clerk stamp and merely states it was delivered to the office of the district attorney

— it does not state it was delivered via certified mail, return receipt requested and there is no evidence of a green card in the record. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(b); *Votta*, 299 S.W.3d at 135.

Huff contends we should liberally construe the requirements of article 51.14 because the article itself provides that it shall be "liberally construed to effectuate its purposes," which are "to encourage the expeditious and orderly disposition" of pending charges and determine the status of detainers based on untried charges. TEX. CODE CRIM. PROC. ANN. art. 51.14, Arts. I, IX. Huff contends the State was aware as of March 27, 2012 — pursuant to his motion to dismiss — that he was in federal custody and was demanding a speedy trial. Huff seems to contend his compliance failures are merely technical, and given the liberal construction language and the purpose of the statute, his failures should not preclude a dismissal. In sum, according to Huff, because the State had sufficient notice by way of counsel's motion, but failed to bring Huff to trial within 180 days, the IADA mandates dismissal. We disagree.

The prisoner bears the burden of compliance with the procedural requirements of the IADA. *Walker v. State*, 201 S.W.3d 841, 846 (Tex. App.—Waco 2006, pet. ref'd); *Morganfield v. State*, 919 S.W.2d 731, 734 (Tex. App.—San Antonio 1996, no pet.). Article III(b) of article 51.14 specifically states the prisoner *must* deliver his request for a final disposition to the warden or other official having custody over him. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(b) (emphasis added). Despite the mandatory language of Article III(b), several intermediate appellate courts in this state have held a prisoner may also deliver his request directly to the court and prosecuting attorney, rather than to the warden. *Walker*, 201 S.W.3d 846; *Snyder v. State*, No. 08-04-00246-CR, 2005 WL 2313676, at *1 (Tex. App.—El Paso Sept. 22, 2005, no pet.) (not designated for publication); *Rowe v. State*, Nos. 01-97-00677-CR & 01-97-00678-CR, 1999 WL 442139, at *7 (Tex. App.—Houston [1st Dist.] July 1, 1999, pet. ref'd) (not designated for

publications); *State v. Powell*, 971 S.W.2d 577, 580 (Tex. App.—Dallas 1998, no pet.); *Lara v. State*, 909 S.W.2d 615, 618 (Tex. App.—Fort Worth 1995, pet. ref'd); *Bryant v. State*, 819 S.W.2d 927, 931 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd); *Burton v. State*, 805 S.W.2d 564, 575 (Tex. App.—Dallas 1991, pet. ref'd). However, even these courts hold that when a prisoner takes it upon himself to deliver the request for final disposition to the prosecutor and the court, he must do so in the proper form and include the statutorily required information. *See Walker*, 201 S.W.3d at 846; *Snyder*, 2005 WL 2313676, at *1; *Rowe*, 1999 WL 442139, at *7; *Powell*, 971 S.W.2d at 580; *Lara*, 909 S.W.2d at 618; *Bryant*, 819 S.W.2d at 931; *Burton*, 805 S.W.2d at 575. As stated by the court in *Walker*:

> If the prisoner delivers the transfer request to the warden where he is incarcerated for forwarding, then the prisoner's "only obligation [i]s to show that he notified the appropriate [prison] officials of his desire to [be transferred]." [citations omitted] Conversely, if the prisoner decides to deliver his transfer request directly to the court and prosecuting attorney of the other state, he is personally responsible to see that the notice is sent by registered or certified mail, return receipt requested, to those authorities. [citations omitted]

201 S.W.3d at 846. And in *Bryant*, the court specifically held letters to the court and prosecutor stating the prisoner's desire for a speedy trial, a final disposition, and dismissal were insufficient under the IADA — and therefore the prisoner was not entitled to a dismissal — because the prisoner failed to include the statutorily required certificate or the information that should have been included therein. 819 S.W.2d at 930–31.

Accordingly, assuming a prisoner may himself deliver the request for final disposition to the court and prosecuting attorney, or do so through counsel, rather than by delivering it to the warden, we too hold he or his attorney must do so in accordance with the requirements of the IADA. *See Walker*, 201 S.W.3d at 846; *Snyder*, 2005 WL 2313676, at *1; *Rowe*, 1999 WL 442139, at *7; *Powell*, 971 S.W.2d at 580; *Lara*, 909 S.W.2d at 618; *Bryant*, 819 S.W.2d at 931; *Burton*, 805 S.W.2d at 575. Specifically, when a prisoner decides to notify the prosecutor and the

court directly — or to do so through counsel — the prisoner or counsel must include the certificate and the information required to be included therein, and must send the request by registered or certified mail, return receipt requested. *See Walker*, 201 S.W.3d at 846; *Snyder*, 2005 WL 2313676, at \*1; *Rowe*, 1999 WL 442139, at \*7; *Powell*, 971 S.W.2d at 580; *Lara*, 909 S.W.2d at 618; *Bryant*, 819 S.W.2d at 931; *Burton*, 805 S.W.2d at 575. If the prisoner or his authorized counsel does not include the certificate with the necessary information, or fails to send the request by registered or certified mail, return receipt requested, the 180-day period does not begin to run. *See Bryant*, 819 S.W.2d at 931.

The Supreme Court's decision in *Alabama v. Bozeman*, 533 U.S. 146 (2001), although decided under the IADA provision dealing with time limits for trying prisoners from other states when they are returned to the requesting state at the request of the prosecutor, is instructive. In that case, the prisoner was serving a federal prison sentence in Florida when an Alabama prosecutor sought to arraign him on firearms charges and have counsel appointed. *Bozeman*, 533 U.S. at 151. The prisoner was transferred to Alabama where he spent the night in the county jail. *Id.* The next morning he appeared in an Alabama court with local counsel; the prisoner was returned to federal prison that same evening. *Id.* When Alabama brought the prisoner back for trial one month later, the prisoner moved to dismiss the state charges because he had been returned to Florida, the original place of imprisonment, prior to trial being had on state charges — a violation of the IADA. *Id.* The trial court denied the motion to dismiss, the prisoner was convicted on the state charges, and an intermediate Alabama appellate court affirmed the conviction. *Id.* at 152. The Alabama State Supreme Court reversed, holding the literal language of the IADA controlled, requiring dismissal of the state charges. *Id.* The dissenters on the Alabama Supreme Court argued the violation was merely "technical" and did not require dismissal. *Id.* The United

States Supreme Court affirmed the Alabama Supreme Court, holding that that language of the IADA:

> [M]ilitates against an implicit exception for it is absolute. It says that, when a prisoner is "returned" before trial, the indictment, information, or complaint "*shall not* be of any further force or effect, and the court *shall* enter an order dismissing the same with prejudice." [citations omitted] (emphasis added). The word "shall" is ordinarily "the language of command." [citations omitted]

*Id.* at 153. Although *Bozeman* is factually distinguishable, dealing with a separate provision of the IADA, its broader implication is not. Huff advocates the kind of exception the *Bozeman* Court refused to accept — something less than absolute compliance with the mandatory language. Article III(b) specifically states the 180-day deadlines applies only when the prisoner *shall* have caused to be delivered to the prosecutor and the court his request for final disposition, which *shall* include the certificate described in article III(a) and *shall* be sent by registered or certified mail, return receipt requested. TEX. CODE CRIM. PROC. ANN. art. 51.14, Art. III(a), (b) (emphasis added). The use of "shall" is exactly what the Supreme Court held militated against an implicit exception to the IADA.

We therefore hold that because Huff did not comply with the statutorily mandated requirements of the IADA — neither he nor his counsel provided the state or the court with the certificate and the information required to be included therein, nor did they send the alleged request by registered or certified mail, return receipt request — the 180-day deadline never commenced. Accordingly, because Huff did not comply with the IADA, the trial court did not err in denying his motion to dismiss, and we overrule this issue.

### *Speedy Trial*

Huff also asserts that even if this court concludes he did not comply with the requirements of the IADA, he is still entitled to a dismissal because he was denied his right to a speedy trial under the United States and Texas Constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I,

§ 10.[3] Huff correctly points out that the requirements for a "speedy trial" under the IADA do not apply to a constitutionally-based speedy trial claim.

*Standard of Review*

When we review a trial court's ruling on a motion to dismiss based on a speedy trial claim, we apply a bifurcated standard of review. *Gonzales v. State*, 435 S.W.3d 801, 808 (Tex. Crim. App. 2014); *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008). We give almost total deference to the trial court's historical findings of fact that are supported by the record and to the trial court's reasonable inferences drawn from those facts, and we view all of the evidence in favor of the trial court's ultimate ruling. *Gonzales*, 435 S.W.3d at 808–09; *Cantu*, 253 S.W.3d at 282. With regard to factual issues, when the trial court assesses the evidence at a speedy trial hearing, it may completely disregard a witness's testimony based on credibility and demeanor evaluations, even if the witness's testimony is uncontroverted. *Cantu*, 253 S.W.3d at 282. The trial court is also entitled to disbelieve any evidence as long as it has a "reasonable and articulable reason for doing so." *Id.*

With regard to the legal components of a speedy trial review, we conduct a de novo review in determining whether there was sufficient presumptive prejudice to proceed to a *Barker v. Wingo* analysis and in weighing the factors set out in that case — these are legal questions. *Gonzales*, 435 S.W.3d at 808–09; *Cantu*, 253 S.W.3d at 282. "Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but "[t]he balancing test as a whole . . . is a purely legal question." *Cantu*, 253 S.W.3d at 282 (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 n.19 (Tex. Crim. App. 2002)).

---

[3] *See* Tex. Const. art. I, § 10. The Texas Court of Criminal Appeals has held that although the right to a speedy trial guaranteed by the Texas Constitution is independent of the right guaranteed by the Sixth Amendment of the United States Constitution, the analysis for claims under the Texas Constitution is the same as for claims under the Sixth Amendment. *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992).

*Application*

The Sixth Amendment of the United States Constitution, which is applicable to the states through the Fourteenth Amendment, guarantees an accused the right to a speedy trial. U.S. CONST. amends. VI, XIV; *Gonzales*, 435 S.W.3d at 808; *Cantu*, 253 S.W.3d at 280. We analyze speedy trial claims "on an ad hoc basis," weighing and balancing the factors set out in *Barker v. Wingo*: (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right; and (4) the prejudice to the accused. *Gonzales*, 435 S.W.3d at 808; *see Barker v. Wingo*, 407 U.S. 514, 530 (1972). The State must justify the length of the delay; however, the defendant must prove assertion of the right and show prejudice. *Cantu*, 253 S.W.3d at 281. The defendant's burden "varies inversely" with the State's degree of culpability for the delay. *Id.* (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Id.* at 280–81.

The *Barker* analysis is not triggered until the defendant makes a threshold showing that the delay is sufficiently unreasonable so as to be "presumptively prejudicial." *Gonzales*, 435 S.W.3d at 808 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)); *Cantu*, 253 S.W.3d at 281 (same). Although there is no bright line rule regarding when a delay is "presumptively prejudicial," the Court of Criminal Appeals has held that a four-month delay is insufficient, but a seventeen-month delay is sufficient. *Cantu*, 253 S.W.3d at 281 (citing *Pete v. State*, 501 S.W.2d 683, 687 (Tex. Crim. App. 1973) (holding four-month delay is not presumptively prejudicial); *Phillips v. State*, 650 S.W.2d 396, 399 (Tex. Crim. App. 1983) (holding seventeen-month delay is presumptively prejudicial)). If the reviewing court determines the delay is presumptively prejudicial, it must analyze the speedy trial claim by first weighing the strength of the remaining factors and then balancing their relative weights in light of "the conduct of both the prosecution

and the defendant." *Cantu*, 253 S.W.3d at 281 (quoting *Barker*, 407 U.S. at 530). In other words, the *Barker* factors are related and must be considered together along with any other relevant circumstances, and no one factor is either necessary or sufficient to find a speedy trial violation. *Cantu*, 253 S.W.3d at 281. Accordingly, a reviewing court must "engage 'in a difficult and sensitive balancing process' in each individual case" to determine whether a dismissal in favor of the defendant is warranted. *Id.* (quoting *Barker*, 407 U.S. at 533); *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (citing *Barker*, 407 U.S. at 530).

### a. *Length of Delay*

Courts measure the length of delay "from the time the accused is arrested or formally accused." *Gonzales*, 435 S.W.3d at 809. A delay that is longer than the minimum needed to trigger an analysis under *Barker* weighs against the State. *Id.* Moreover, "the longer the delay, the more the defendant's prejudice is compounded" because "'the presumption that pretrial delay has prejudiced the accused intensifies over time.'" *Id.* (quoting *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002) (quoting *Doggett*, 505 U.S. at 652)).

The State concedes the delay in this case is presumptively prejudicial so as to trigger the *Barker* analysis, and we agree. Huff was arrested August 6, 2009, and thereafter indicted; however, the original indictment was dismissed by the State and Huff was reindicted on April 11, 2011. Trial began on June 24, 2013, when the parties engaged in voir dire with the potential jurors. Whether we consider the original arrest date or subsequent indictment, the delay is presumptively prejudicial. From arrest, almost four years had elapsed prior to trial, and even from the second indictment, more than two years had elapsed — both are far longer than the seventeen-month delay found presumptively prejudicial in *Phillips*. *See* 650 S.W.2d at 399. Because the delay was beyond the minimum needed to trigger the *Barker* inquiry, this factor weighs heavily in favor of finding a violation of Huff's right to a speedy trial. *See Zamorano*, 84 S.W.3d at 649.

*b. Reason for Delay*

As to the second *Barker* factor — reason for the delay — it looks to the reasons put forth by the State to justify the delay. *Gonzales*, 435 S.W.3d at 809 (citing *Barker*, 407 U.S. at 531). The Court of Criminal Appeals advises that when we assess the State's reasons, we must assign different weights to different reasons. *Gonzales*, 435 S.W.3d at 809 (citing *Zamorano*, 84 S.W.3d at 649). Quoting *Zamorano*, the *Gonzales* court explained:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

435 S.W.3d at 809–10 (quoting *Zamorano*, 84 S.W.3d at 649). Thus, reasons that are unjustifiable count toward the length of delay, but justifiable reasons do not. *Gonzales*, 435 S.W.3d at 809 (citing *Barker*, 407 U.S. at 531–32).

At the speedy trial hearing, Huff's counsel told the trial court he had been prepared and ready to go to trial as scheduled on February 14, 2011, pursuant to the State's original involuntary manslaughter indictment. However, the record shows Huff's counsel moved for a continuance on February 14, 2011. In the motion for continuance, Huff's counsel cited numerous reasons for the delay: (1) a pending competency hearing for another client; (2) current schedule of other cases preventing necessary preparation for trial; and (3) medical issues with regard to a defense witness that would create a "physical difficulty" for the witness if required to appear at this time. The next day, the trial court granted the State's motion to dismiss the indictment, and Huff was reindicted on murder charges in April. Thereafter, trial dates were set for May, June, August, and September of 2011, but as noted above, trial did not begin until June of 2013.

The record does not include reasons for the State's failure to bring Huff to trial from May to September, but it is undisputed that in September 2011, Huff was arrested on an outstanding federal warrant and incarcerated in a federal facility. No trial dates were set after the September 2011 setting. In fact, it appears from the record Huff's case dropped off the court's docket. The reason for this was attributed by the trial court to the district clerk — the trial court specifically states: "I haven't been able to figure out why the case didn't come up on the docket for so long a period of time. That is disturbing that it apparently languished without being set, *but that's the district clerk's issue, not ours, and the setting clerk's issue*." (emphasis added).

Thus, much of the delay appears to be the result of negligence, but as noted above, this weighs against the State, though not as heavily as would a deliberate delay, particularly in this case where the trial court acknowledged that it was seemingly the clerk's fault the matter dropped off the docket. *See Gonzales*, 435 S.W.3d at 809–10. Because the State offered the trial court no explanation for the delay, this too weighs in favor of a speedy trial violation, but not heavily. *Dragoo v. State*, 96 S.W.3d 308, 313–14 (Tex. Crim. App. 2003). In the absence of an explanation, the trial court cannot presume either a deliberate delay by the State in order to prejudice the defendant or a valid reason for the delay. *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003); *Dragoo*, 96 S.W.3d at 314.

There is, however, some responsibility for the delay to be assigned to Huff as well. It is clear that when the case was first set for trial on February 14, 2011, Huff's counsel was not ready. He filed a motion for continuance citing several reasons to delay the trial. Thereafter, Huff was arrested on a federal warrant and removed from the jurisdiction. Additionally, when asked by the trial court at the May 20, 2013 hearing on Huff's motion for speedy trial whether he was ready to proceed, Huff's counsel stated they were "not ready . . . we're not prepared to proceed on the — on the murder case." Admittedly, this second continuance resulted in a delay of only a month.

Based on the foregoing, we hold the reason for the delay — or lack thereof — weighs against the State and in favor of a speedy trial violation. *See Gonzales*, 435 S.W.3d at 809–10; *Dragoo*, 96 S.W.3d at 313–14. However, we further hold that it does not weigh heavily against the State or in favor of dismissal as the delay was the result of negligence, some of the negligence could be attributed to the clerk according to the trial court, and Huff bore some responsibility for the delay. *See Gonzales*, 435 S.W.3d at 809–10; *Dragoo*, 96 S.W.3d at 313–14.

c. <u>*Assertion of Right to Speedy Trial*</u>

It is undisputed that Huff was arrested and initially indicted in 2009. He was out on bond soon thereafter. He was then reindicted in April 2011, but he was again free on bond within days. It was not until he was arrested in September 2011 by federal authorities that he was incarcerated and remained so. However, Huff did not file his motion for a speedy trial, which referenced only a speedy trial under the IADA, until March 27, 2012. He then filed, in essence, the same motion on January 7, 2013, again referencing only the IADA. It was not until the date of trial, June 24, 2013, that Huff filed a motion asserting his rights to a speedy trial under the United States and Texas Constitutions. Notably, it was not until this motion was filed that Huff requested a hearing on any speedy trial claim. It does not appear from the record that Huff made any attempt to have even his IADA speedy trial claims heard by the court until pretrial motions were heard in May 2013 — a month before trial (when he asked for a continuance because he was not ready on the murder charge).

The timing of a defendant's assertion of his speedy trial claim affects the other *Barker* factors. *Gonzales*, 435 S.W.3d at 810–11 (citing *Barker*, 407 U.S. at 531). Accordingly, the defendant's assertion of his right to a speedy trial "'is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right [to a speedy trial].'" *Gonzales*, 435 S.W.3d at 810–11 (quoting *Barker*, 407 U.S. at 531–32). Here, Huff did not file his first

speedy trial motion, which was limited to the right to trial under the IADA, until March 27, 2012 — more than two-and-a-half years after his original arrest and indictment, and almost a year after he was reindicted. Huff did not file his motion for a speedy trial pursuant to the Sixth Amendment and Article I, section 10 until the day of trial. Moreover, even if we consider the IADA motion from September as an assertion of Huff's right to a speedy trial under the federal and state constitutions, at no time prior to May 2013 — a month before trial — does it appear that Huff attempted to have his claim *heard* by the trial court.

We hold Huff's demand — even if we can consider a demand for a speedy trial under the IADA a constitutional demand for a speedy trial in the absence of language referencing same — was not timely, coming more than two-and-a-half years after his original arrest and indictment, and almost a year after he was reindicted. The failure to timely assert a speedy trial claim "'makes it difficult for a defendant to prove he was denied a speedy trial.'" *Dragoo*, 96 S.W.3d at 314 (quoting *Barker*, 407 U.S. 532). The absence of a timely demand strongly suggests Huff did not really want a speedy trial and that he was not prejudiced by the lack of one. *See Dragoo*, 96 S.W.3d at 314 (citing *Barker*, 407 U.S. at 532). Huff's inaction weighs more heavily against a violation the longer the delay becomes, and here the delay was quite extensive. *See id.* Accordingly, we hold Huff's delay in asserting his right to a speedy trial weighs heavily against finding a constitutional violation of his right to a speedy trial. *See id.*

### d. *Prejudice to Huff*

Finally, when analyzing the prejudice, if any, to Huff, we must do so in light of the interests the right to a speedy trial was designed to protect: (1) freedom from oppressive pretrial incarceration; (2) mitigation of the anxiety and concern accompanying public accusation; and (3) avoidance of impairment to the accused's defense. *See Cantu*, 253 S.W.3d at 285. The supreme

court has held that of these three interests, the third one is the most serious because a defendant's inability to prepare his defense affects the fairness of the entire system. *Id.*

As to Huff's incarceration, he quickly made bond each time he was arrested on the state charges. Huff presented no evidence that it was difficult for him to obtain bond. Huff was only incarcerated because he was arrested by *federal authorities* pursuant to a federal warrant. Huff presented no evidence he suffered anxiety or concern over the murder accusation, which was based on his third DWI. Thus, we are left with the third, most serious factor — impairment to Huff's defense.

Huff points out that one of his witnesses had difficulty remember details, and another witness experienced trouble remembering dates. The State points out Huff did not present evidence of his witnesses' faulty memories at the hearing on the speedy trial motion. He points only to the witnesses' trial testimony. When we review a trial court's ruling on a motion to dismiss based on an alleged speedy trial violation, we must do so based on the arguments, information, and evidence available to the trial court at the time it ruled. *Shaw*, 117 S.W.3d at 889 (citing *Dragoo*, 96 S.W.3d at 313). However, affirmative proof of prejudice is not necessary for every speedy trial claim because excessive delay presumptively prejudices the defendant in ways he may be unable to prove. *See Doggett*, 505 U.S. at 655. Nevertheless, the presumption of prejudice to Huff's ability to defend himself is extenuated by his acquiescence in the delay. *Id.* at 658. Accordingly, although we presume the lengthy delay adversely affected Huff's ability to defend himself, this presumption is extenuated — as is any theoretical prejudice — due to Huff's extensive delay in asserting his right to a speedy trial under the constitution. As noted above, unless we consider the motion requesting a speedy trial under the IADA as a request under the constitution, Huff did not request a speedy trial until the day of trial. And even considering the March 27, 2013 IADA motion, it was not filed until more than two-and-a-half years after his original arrest and

indictment, and almost a year after he was reindicted. Thus, we hold Huff suffered no prejudice, weighing against his speedy trial claim.

    *e.   Balancing the Barker Factors*

Having addressed the *Barker* factors, we must now balance them. *See Cantu*, 253 S.W.3d at 280. Weighing in favor of finding a violation of Huff's right to a speedy trial is the extensive length of the delay and the absence of any reason for most of the delay. The first weighs heavily in favor of dismissal, but the second factor less so. The third and fourth factors weigh heavily against a finding of a speedy trial violation. Huff failed to assert his right, arguably, until the day of trial, but even if we consider the March 27, 2013 IADA motion as an assertion of the constitutional right, Huff waited more than two-and-a-half years after his original arrest and indictment, and almost a year after he was reindicted to file the motion. Moreover, he waited until May 2013 to present the motion to the trial court. Finally, as to the fourth factor, Huff has failed to establish any prejudice. Given that he did not file the March 27, 2013 motion until three months before trial, the inability of his witnesses to recall specific details is attributable to his own delay in asserting his claim. Accordingly, we hold the weight of the four factors, when balanced together, militates against finding a violation of Huff's right to a speedy trial.

### Motion to Suppress

Finally, Huff contends the trial court erred in failing to grant his motion to suppress. Specifically, he argues his motion should have been granted because the Supreme Court's decision in *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552 (2013) requires the existence of exigent circumstances before a police officer can require a warrantless, nonconsensual blood draw pursuant to section 724.012(b) of the Texas Transportation Code, and there were no exigent circumstances in this case. The State counters, arguing the blood draw was permissible under the

Transportation Code, but even if it was not, exigent circumstances existed or the officer acted in good faith reliance on the Transportation Code.

*Standard of Review*

Appellate courts review trial court rulings on motions to suppress under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). With regard to a determination of historical facts, we afford great deference to a trial court's determination. *Id.* This is because trial judges are uniquely situated to observe the demeanor and appearance of any witnesses. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). As the sole fact finder at a suppression hearing, a trial court may believe or disbelieve any portion of a witness's testimony and make reasonable inferences from the evidence presented. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). However, whether a specific search or seizure is reasonable or supported by probable cause is a question of law subject to de novo review. *Dixon v. State*, 206 S.W.3d 613, 616 (Tex. Crim. App. 2006).

*Application*

In several recent cases, this court analyzed *McNeely* and concluded section 724.012(b) does not constitute a valid exception to the warrant requirement of the Fourth Amendment. *See, e.g., Aviles v. State*, 443 S.W.3d 291, 294 (Tex. App.—San Antonio 2014, pet. filed); *McNeil v. State*, 443 S.W.3d 295, 300 (Tex. App.—San Antonio 2014, pet. filed); *Weems v. State*, 434 S.W.3d 655, 665 (Tex. App.—San Antonio 2014, pet. granted). Section 724.012(b) is often referred to as the mandatory blood draw statute. Subsection(b)(1)(B), which is at issue in this case, provides that an officer can require a person to submit to a breath test or blood draw when an individual other than the person has suffered serious bodily injury — in this case, the record establishes Harding-Watts suffered serious bodily injury. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(B) (West 2011). In *Weems*, we held *McNeely* "clearly proscribed what it labeled *categorical* or *per se* rules for

- 28 -

warrantless blood testing, emphasizing over and over again that the reasonableness of a search must be judged based on the totality of the circumstances presented in each case." *Weems*, 434 S.W.3d at 665 (citing *McNeely*, 133 S.Ct. at 1560–63). In *Weems*, as well as in *Aviles* and *McNeil*, we held the mandatory blood draw statute creates the kind of categorical or per se rule rejected by the Supreme Court in *McNeely*. *Aviles*, 443 S.W.3d at 293; *McNeil*, 443 S.W.3d at 300; *Weems*, 434 S.W.3d at 665. The statute simply does not allow for consideration of the totality of the circumstances present in each case as required. *Weems*, 434 S.W.3d at 665. Rather, these statutes consider only certain facts, when *McNeely* mandates a consideration of the totality of the circumstances. *Id.* Accordingly, we held the mandatory blood draw statute, although not unconstitutional per se,[4] is not a valid exception to the Fourth Amendment's warrant requirement. *See Aviles*, 443 S.W.3d at 294; *McNeil*, 443 S.W.3d at 300; *Weems*, 434 S.W.3d at 665.

Therefore, based on the analyses and holdings in our prior opinions, we hold the trial court erred in denying Huff's motion to suppress based on a blood draw pursuant to section 724.012(b) of the Transportation Code. *See Aviles*, 443 S.W.3d at 294; *McNeil*, 443 S.W.3d at 300; *Weems*, 434 S.W.3d at 665. We again hold that *McNeely* requires the existence of exigent circumstances or some other *recognized* exception to the warrant requirement before a police officer can order a warrantless, nonconsensual blood draw pursuant to the provisions of the Texas Transportation Code, including section 724.012(b).

a. *Exigency*

As noted above, the State contends that even if a blood draw was impermissible under section 724.012(b)(1)(B), the exigency exception justified the warrantless blood draw. We

---

[4] This court did not hold, and does not now hold, that section 724.012(b) is unconstitutional. Rather, we merely held that under *McNeely*, it did not create a per se exception to the Fourth Amendment's warrant requirement. The statute may be constitutional for other purposes.

disagree — as did the trial court. At the hearing on the motion to suppress, Officer Peeler testified he requested a mandatory blood draw without a warrant because Harding-Watts suffered serious bodily injury and he believed Huff was under the influence. When queried as to whether he could have obtained a warrant, Officer Peeler first testified it would have been impossible for him to obtain a warrant after hours because there were no procedures in place for doing so. However, when specifically asked if there were "any exigent circumstances that prevented [him] from getting a warrant[,]" Officer Peeler admitted there were not. Officer Peeler was the only witness at the suppression hearing, and he in essence admitted he relied on the mandatory blood draw statute to seize Huff's blood — normal procedure for San Antonio police officers.

Although the trial court ultimately denied Huff's motion to suppress, the trial court expressly rejected the State's assertion of exigency, as do we. The trial court noted the officer testified there were no exigent circumstances; rather, it was simply the normal procedure for officers not to seek warrants under these types of circumstances. The trial court stated there were "full-time 24/7 magistrates" available: "Trust me, I've signed many warrants at 3:00 o'clock in the morning at my house. So there's plenty of judges that will sign a warrant. So we are dealing solely . . . on [the officer's] testimony that procedurally . . . [he] elected not to get a warrant because [he] didn't think [he] needed to." Accordingly, the court ruled there were no exigent circumstances. We agree.

Admittedly, "[t]here is a strong preference for searches to be administered pursuant to a warrant." *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007); *see Illinois v. McArthur*, 531 U.S. 326, 338 (2001) (Souter, J., concurring) ("[A] search with a warrant has a stronger claim to justification on later, judicial review than a search without one."). Nevertheless, not all warrantless searches are invalid. *Gutierrez*, 221 S.W.3d at 685. However, once a defendant establishes there was no warrant, the burden shifts to the State to prove the warrantless search was

reasonable under the totality of the circumstances. *Amador*, 221 S.W.3d at 672–73. The State satisfies this burden if it proves an exception to the warrant requirement. *See Gutierrez*, 221 S.W.3d at 685.

Exigency is an established exception, and it "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *McNeely*, 133 S.Ct. at 1558 (quoting *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011)). To determine whether the warrantless search was permissible based on exigency, we must look to the totality of the circumstances. *McNeely*, 133 S.Ct. at 1559. We review the evidence presented at the suppression hearing to determine whether, under the totality of the circumstances, the State proved the existence of exigent circumstances so as to permit a warrantless blood draw.

Here, as noted above, the only evidence produced by the State at the suppression hearing was provided by Officer Peeler. Officer Peeler specifically admitted there were no exigent circumstances that prevented him from obtaining a warrant. Rather, he testified it was simply not the practice of San Antonio police officers to obtain a warrant under circumstances such as those presented in this case.

In *McNeely*, the Supreme Court held "the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search." 133 S.Ct. at 1568. However, in this case, the officer admitted there were no exigent circumstances and the undisputed evidence establishes Officer Peeler never even considered trying to obtain a warrant — though it was clear he could have if he needed to.

We agree with the trial court's finding that there were no exigent circumstances. Rather, the officer never thought of obtaining a warrant because it was not standard procedure.

Accordingly, we hold this record does not show that under the totality of the circumstances, the warrantless blood draw was justified by the exigency exception to the Fourth Amendment's warrant requirement. *See id.* at 1558–59.

   b. *Good Faith*

The State also contends that even if the blood draw was impermissible based on *McNeely* and the absence of exigent circumstances, the blood evidence was properly admitted under the good faith exception to the exclusionary rule. The State notes Officer Peeler relied upon section 724.012(b)(1)(B) of the Transportation Code, which permits an officer to require a DWI arrestee to provide a blood sample if an individual suffered serious bodily injury as a result of the DWI. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(B).

When the State obtains evidence in violation of the Fourth Amendment, as it did here, the federal exclusionary rule usually precludes the use of that evidence in a criminal proceeding against the party whose rights were violated. *Illinois v. Krull*, 480 U.S. 340, 347 (1987) (citing *Weeks v. United States*, 232 U.S. 383 (1914); *Mapp v. Ohio*, 367 U.S. 643 (1961)). The rule's purpose is to deter prospective police misconduct, thereby securing the Fourth Amendment's guarantee against unreasonable searches and seizures. *Krull*, 480 U.S. at 347 (citing *United States v. Calandra*, 414 U.S. 338, 347 (1974)). However, under federal law, if law enforcement personnel rely in good faith on a statute authorizing a warrantless search, and the statute in question is later found to be unconstitutional, the evidence seized need not be excluded. *Krull*, 480 U.S. at 349–50. Accordingly, the question is whether Officer Peeler could, in good faith, rely upon section

724.012(b)(1)(B) when he decided not to obtain a warrant before subjecting Huff to a mandatory blood draw.[5]

The mandatory blood draw statute does not provide for a warrantless search. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(B); *McNeil*, 443 S.W.3d at 303. Although the statute states an officer shall take a blood draw if an individual suffered serious bodily injury as a result of the DWI, it does not *mandate* that he do so without a warrant. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(B); *McNeil*, 443 S.W.3d at 303. Rather, the statute simply does not address, much less dispense with, the Fourth Amendment's warrant requirement for blood draws. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(B); *McNeil*, 443 S.W.3d at 303. Thus, we cannot say Officer Peeler acted in good faith when he failed to obtain a warrant based upon a statute that does not dispense with the warrant requirement. *See* TEX. TRANSP. CODE ANN. § 724.012(b)(1)(B); *McNeil*, 443 S.W.3d at 303. Accordingly, we hold the good faith exception does not apply here.

### c. *Harm Analysis*

We have determined the trial court erred in denying Huff's motion to suppress because the blood draw in this case violated Huff's rights under the Fourth Amendment. Because this is an error of constitutional magnitude, we must reverse the judgment unless we determine beyond a reasonable doubt the trial court's error did not contribute to the conviction. TEX. R. APP. P. 44.2(a); *see Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001) (holding harm analysis for erroneous admission of evidence obtained in violation of Fourth Amendment is Rule 44.2(a)'s constitutional standard).

---

[5] Pursuant to article 38.23 of the Texas Code of Criminal Procedure, the only good faith exception is when an officer "acting in objective good faith" relies upon a warrant issued by a magistrate based on probable cause. TEX. CODE CRIM. PROC. ANN. art. 38.23(b) (West 2005). It is undisputed Officer Peeler did not obtain a warrant in this case.

We must reverse Huff's conviction unless we conclude beyond a reasonable doubt the trial court's error did not contribute to his conviction, and in doing so, we consider: (1) the nature of the error; (2) the extent it was emphasized by the State; (3) the probable implications of the error; and (4) the weight the jury likely have assigned to it during deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). As the Court of Criminal Appeals stated in *Snowden*, these factors are not exclusive and other factors may be relevant to the analysis. *Id.* "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular error] did not contribute to the conviction or punishment.'" *Id.* (quoting TEX. R. APP. P. 44.2(a)).

Under similar facts, we held in *Weems* that the trial court's error in denying the motion to suppress was harmful. 434 S.W.3d at 667. We noted that the jury was instructed as to the definition of "intoxicated," which included "having an alcohol concentration of 0.08 or more," and there was testimony from Veronica Hargrove, a toxicologist with the Bexar County Medical Examiner's Office, that at the time of the blood draw the defendant's blood alcohol concentration was 0.18, making it likely that his blood alcohol concentration was 0.24 at the time of the accident. *Id.*

In this case, during voir dire, the State specifically advised the potential jurors that:

"[B]ottom line is though, if a person is above .08 we don't argue about it. If we know their blood alcohol concentration is above a .08 there's no argument about it. And — and the reason why is because if you have ever known let's say somebody who drinks a lot or somebody who is a full-blown alcoholic, sometimes they can be above .08 and they can walk around just fine and they can talk to you just fine and you can't always tell. But above .08 we don't argue about it. Does that make sense[?]"

Then, in its case-in-chief, the State relied upon similar testimony to that in *Weems* from the same toxicologist, Veronica Hargrove. Here, she testified Huff's blood sample had a blood alcohol

concentration of 0.17 grams per deciliter, more than twice the legal limit of 0.08, and that a person shows signs of impairment from alcohol consumption at 0.05 grams per deciliter. The toxicology report showing Huff's blood alcohol level was admitted into evidence. Hargrove also testified that given the elimination rate of alcohol from the body, it was unlikely Huff's blood alcohol content was less than 0.08 at the time of the accident.

Additionally, during its closing argument, the State referenced Huff's blood alcohol concentration:

> You can drive while intoxicated in the State of Texas, **be at a .17, more than two times the legal limit**, and the first time if you don't kill anybody like he did, it's a misdemeanor. You can do the same thing again, and if you don't kill anybody it's still a misdemeanor. But the third time, three strikes, you're out, it's a felony. And if you kill someone and we can prove all those things, then you're facing a charge for murder because drunks don't choose who, when, and how they will kill.

> \* \* \*

> It was [Huff's] intent to drive while intoxicated. And you know what the interesting thing about this is? If you think back over the course of the trial, they know that. And if there was any doubt when the toxicologist was on the stand and they asked, [w]ell, if he's at .17 three and a half hours after the crash, how can he say he's above a .08, hypothetically speaking, while he was driving?

Finally, the jury was instructed, as it was in *Weems*, about the definition of "intoxicated," which included "having an alcohol concentration of .08 or more." Given the State's comments during voir dire, the testimony from the toxicologist, the State's reference to the blood alcohol in its argument, and the jury instruction, we cannot say beyond a reasonable doubt that the trial court's error in denying Huff's motion to suppress did not contribute to his conviction. Accordingly, we sustain Huff's issue with regard to the denial of his motion to suppress and hold the trial court's error reversible, entitling Huff to a new trial.

## CONCLUSION

Based on the foregoing, we overrule Huff's sufficiency complaint, his complaint under the IADA, and his speedy trial contention. However, we sustain Huff's challenge to the trial court's denial of his motion to suppress and hold this was reversible error. Accordingly, because the warrantless blood draw violated Huff's Fourth Amendment rights and we cannot say beyond a reasonable doubt that the erroneous admission of the results of the blood draw did not contribute to his conviction, we reverse the trial court's judgment and remand this matter for a new trial.

Marialyn Barnard, Justice

Publish



# Fourth Court of Appeals
## San Antonio, Texas

May 11, 2015

No. 04-13-00891-CR

Donald F. **HUFF**,
Appellant

v.

**THE STATE OF TEXAS,**
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2011CR2990
Honorable Sid L. Harle, Judge Presiding

## O R D E R

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

The panel has considered the State's Motion for Rehearing, and the motion is DENIED.

_____
Marialyn Barnard, Justice

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the said court on this 11th day of May, 2015.

_____
Keith E. Hottle
Clerk of Court