

NUMBER 13-14-00717-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ERNESTO BERLANGA,                                                                 Appellant,

v.

THE STATE OF TEXAS,                                                                 Appellee.

**On appeal from the 107th District Court of
Cameron County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Longoria
Memorandum Opinion by Justice Garza**

A jury found appellant, Ernesto Berlanga, guilty of murder, a first-degree felony.

*See* TEX. PENAL CODE ANN. § 19.02(b), (c) (West, Westlaw through 2015 R.S.).   The trial

court sentenced appellant to life imprisonment.  *See id.* § 12.32 (West, Westlaw through

2015 R.S.). By two issues, appellant contends: (1) the evidence is insufficient to support his conviction; and (2) his right to a speedy trial was violated. *See* U.S. CONST. amends. VI, XIV, § 1; TEX. CONST. art. 1, § 10; TEX. CODE CRIM. PROC. ANN art. 1.05 (West, Westlaw through 2015 R.S.). We affirm.

## I. BACKGROUND

George Roussett, an officer with the Cameron County Sheriff's Department, testified that in the early morning hours of August 4, 2005, he was "flagged down" by Ricardo Alvear in the Cameron Park neighborhood of Cameron County. Alvear reported that a woman was lying unconscious in a small trailer nearby. Officer Roussett found the victim, later identified as Patricia Salas—also known as "Larry"—lying on the floor unresponsive and without a pulse with a small puncture wound to her neck. EMS personnel transported Salas's body to a facility. Other officers arrived to assist with the investigation. Officer Roussett spoke to Marcela Martinez, who said that she was walking to Salas's trailer to borrow a television. As she approached the trailer, she saw two men running from the property. Martinez saw Salas lying on the floor of the trailer and sought help from Alvear, who then flagged down the officer. Officer Roussett said that Martinez was "very, very nervous" and was difficult to understand because she has a speech impediment.

Officer Jose Barreda testified that he assisted Officer Roussett in the investigation of Salas's murder. Officer Barreda was patrolling the neighborhood when he encountered appellant, who appeared to be highly intoxicated, walking in the middle of the street. Appellant fit the description of one of the men seen running from Salas's trailer. Officer Barreda took appellant back to the crime scene, where he was identified by Martinez. Appellant was arrested for public intoxication. Appellant's shoes and clothing were

2

collected as evidence.

Martinez testified that she had known Salas about a year. Martinez—who knew Salas as "Patty"—was Salas's neighbor; Martinez lived behind Salas's trailer. Martinez testified that around six in the evening on the night of the murder, she and her children went to Salas's trailer to watch television. She and the children fell asleep on the floor at Salas's trailer. She woke up in the middle of the night because appellant and Salas were arguing. When Martinez awoke, appellant, Salas, and another man from the neighborhood, Nieves Salinas, were in the kitchen of the trailer. Martinez stated that appellant hit Salas on her face, and she fell to the floor. According to Martinez, after Salas fell, both men left. However, appellant returned, picked up an ice pick from the kitchen table, and stabbed Salas in the neck. Martinez stated that when appellant stabbed Salas, Salinas was standing outside the door. Martinez told Salinas to get appellant out, and both men left. Martinez sought help, and the officers and EMS personnel arrived. Martinez stated that the officers brought appellant back to the trailer, and she identified him. Martinez admitted that when she first gave a statement to the officers, she gave a different story because she was scared.

On cross-examination, Martinez admitted that she gave officers several versions of events. She first told the officers that she saw two men running from the trailer and did not know who they were.

Nieves Salinas testified that he walked to "Larry's" house around 1:00 a.m. the night of the murder. Salinas observed appellant following him that evening. According to Salinas, appellant was "like on drugs or alcohol, very wasted." Approximately fifteen minutes after Salinas arrived at the trailer, appellant came to the trailer. Salinas stated that he was drinking a beer at the kitchen table and appellant was talking to Salas in the

3

bedroom. Salinas heard a woman scream, "Take him, take him." Salinas stated that he saw Salas on the floor. He took appellant outside, left him at the corner, and went home. Salinas testified he did not see appellant hit Salas. Salinas denied that he or Salas used drugs that evening.

On cross-examination, Salinas admitted that in his written statement, he said that he saw appellant and Salas punching each other. Salinas stated that Salas was on the floor when he got up from the kitchen table. He and appellant left the trailer. Shortly after Salinas returned home, the police arrived and took him to the sheriff's office, where he gave a statement.

Carlos Garza, an officer with the Cameron County Sheriff's Office, testified that he investigated Salas's murder. Garza stated that there was no blood where Salas's body was found. Lighters and pipes used for smoking crack cocaine were found on the kitchen table. Garza interviewed appellant at the sheriff's office around 10:00 a.m. the morning following the murder. Garza stated that appellant did not appear to be intoxicated when he was questioned. Appellant had a red area on his forehead when he was interviewed. Appellant's statement was admitted into evidence.

On cross-examination, Garza stated that there was no visible blood at the crime scene, and investigators did not conduct any forensic testing at the scene. Garza admitted that he did not speak to Alvear, the person who flagged down Deputy Roussett; Alvear was reportedly standing in front of Salas's trailer.

Alejandro Madrigal, a forensic DNA analyst with the Department of Public Safety Crime Laboratory in McAllen, Texas, testified that he tested a blood stain found on one of appellant's shoes, but was unable to recover sufficient DNA to obtain a DNA profile. Madrigal stated that he was unable to detect whether the stain was human blood. On

4

cross-examination, Madrigal testified that he also tested appellant's jeans, shirt, socks, and baseball cap. No stains of evidentiary value were found on appellant's clothing. Madrigal stated that he was not asked to test any clothing belonging to Martinez or Salinas.

Victor Alvarado, an investigator with the Cameron County Sheriff's Office, testified that he was dispatched to Salas's trailer around 4:30 a.m. the night of the murder. Alvarado stated that he did not observe any blood or blood spatter in the area where Salas's body was found. Alvarado testified that a thin screwdriver or pick was found a short distance from the trailer; the pick was sent to the crime lab, but no evidence was found on it.

On cross-examination, Alvarado admitted that he did not order any crime lab testing on clothing worn by Martinez or Salinas. Alvarado stated that he tried several times to contact Alvear, who lived next door to Salas, but was never able to contact him.

Appellant declined to testify, but his written statement was admitted into evidence. In his statement, appellant stated that he visited Salas about 1:00 a.m. and that Salinas was there when he arrived. Appellant stated that Salas and Salinas were smoking crack cocaine and were arguing over the cocaine. Appellant stated that Salinas hit Salas and she fell to the floor. After seeing Salas on the floor, appellant left the house. Salinas came running out of the trailer and said in Spanish that Salas had "pissed [him] off." Appellant stated that Salinas left the scene walking fast. Appellant said that while walking home, he fell and hit his head on the gravel road. Appellant stated that Salinas and Salas frequently smoked crack cocaine together and frequently argued over drugs.

## II. SUFFICIENCY OF THE EVIDENCE

5

By his first issue, appellant contends the evidence is insufficient to support his conviction.

## A. Standard of Review and Applicable Law

Under the *Jackson v. Virginia* sufficiency standard of review, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See* 443 U.S. 307, 318–19 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). This standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence." *Adames*, 353 S.W.3d at 860. We must determine whether the inferences made by the trier of fact are reasonable based on the "cumulative force of all the evidence." *Id.* We conduct this review by measuring the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc); *see Adames*, 353 S.W.3d at 860 (measuring the evidentiary sufficiency with "explicit reference to the substantive elements of the criminal offenses as defined by state law"). As authorized by the indictment in this case, the State was required to show that appellant (1) intentionally or knowingly (2) caused Salas's death (3) by stabbing her in the neck with a screwdriver or other unknown object. *See* TEX. PENAL CODE ANN. § 19.02(b).

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West, Westlaw through 2015 R.S.). Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have intended the result, death, or have been aware that his conduct was reasonably

6

certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85 S.W.3d 242 (Tex. Crim. App. 2002).

It is not necessary that the evidence directly proves the defendant's guilt; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). A defendant's intent, in particular, may be inferred from his words, acts, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In other words, intent and knowledge are fact questions and are almost always proven through evidence of the circumstances surrounding the crime. *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984). Both the identity of the accused and the corpus delicti of an offense may be proven by circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Wheeler v. State*, 35 S.W.3d 126, 134 (Tex. App.—Texarkana 2000, pet. ref'd); *see also Clark v. State*, No. 13–10–00496–CR, 2011 WL 3821055, at *4 (Tex. App.—Corpus Christi Aug. 25, 2011, no pet.) (mem. op., not designated for publication).

### B. Discussion

Appellant argues that the evidence is insufficient because (1) Martinez gave several inconsistent statements to the officers and (2) there was no physical evidence linking him to the murder.

Jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given the witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). As such, they may choose to believe or disbelieve

7

any part of a witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.— Houston [1st Dist.] 2005, no pet.). Likewise, "reconciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State,* 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)). A jury may choose to believe certain testimony and disbelieve other testimony. *Id.* If there is enough credible testimony to support a defendant's conviction, the conviction will stand. *Id.*

Although Martinez gave several inconsistent statements prior to trial, she testified at trial that she saw appellant hit Salas and knock her unconscious. Martinez testified that appellant and Salinas left the trailer, and that appellant returned, grabbed an ice pick from the kitchen table, and stabbed Salas in the neck. According to Martinez, she gave her prior inconsistent statements because she was scared.

Appellant correctly notes that there was no physical evidence linking him to the murder. Appellant does not dispute that he was present, but argues that Salinas must have killed Salas. However, direct evidence, including "physical evidence," is not required to prove guilt. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). It is not necessary that every fact and circumstance point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Acosta,* 429 S.W.3d at 625; *Hooper*, 214 S.W.3d at 13. As long as the verdict is supported by a reasonable inference, it is within the province of the fact finder to choose which inference is most reasonable. *Laster v. State*, 275 S.W.3d 512, 523

(Tex. Crim. App. 2009). Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence. *Acosta*, 429 S.W.3d at 625; *Boston v. State*, 373 S.W.3d 832, 837 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d 321 (Tex. Crim. App. 2013).

Under the *Jackson* standard, we must defer to the jury's credibility and weight determinations, and we will not disturb those findings here. *See Jackson*, 443 U.S. at 319. We hold that reasonable jurors could have found appellant guilty of murder beyond a reasonable doubt, and that the evidence is therefore sufficient to support appellant's conviction. *See id.* We overrule appellant's first issue.

### III. SPEEDY TRIAL VIOLATION

By his second issue, appellant contends that he was denied his constitutional right to a speedy trial.

### A. Standard of Review and Applicable Law

We review a trial court's ruling on a speedy trial claim under a bifurcated standard of review, in which we apply an abuse of discretion standard to the trial court's factual findings and a de novo standard to the trial court's legal conclusions. *Gonzales v. State*, 435 S.W.3d 801, 808–09 (Tex. Crim. App. 2014); *Kelly v. State*, 163 S.W.3d 722, 726 (Tex. Crim. App. 2005). Here, the facts are undisputed. Thus, "we review de novo whether there was sufficient presumptive prejudice to proceed to a *Barker* analysis and the weighing of the *Barker* factors, which are legal questions." *Gonzales*, 435 S.W.3d at 809.

The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution, and is applicable to the states through the Fourteenth Amendment. U.S. CONST. amends. VI, XIV, § 1; *see Barker v. Wingo*, 407 U.S. 514, 515 (1972). This

9

right is also independently guaranteed by the Texas Constitution and the Texas Code of Criminal Procedure. S*ee* TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05 (West, Westlaw through 2015 R.S.). We analyze speedy trial claims by weighing and then balancing four factors set out in *Barker*: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) prejudice to the defendant because of the length of the delay. *Gonzales*, 435 S.W.3d at 808 (citing *Barker*, 407 U.S. at 530).

Before we engage in an analysis of each *Barker* factor, however, the accused must first make a showing that the interval between the accusation and the trial has crossed the threshold dividing ordinary and presumptively prejudicial delay. *Id.* If the defendant can make a threshold showing of presumptive prejudice, the trial court must then proceed to consider each of the remaining *Barker* factors. *Id.* No single factor is dispositive. *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008). Rather, courts must first weigh each factor's strength and then balance their relative weights considering other relevant circumstances, including "the conduct of both the prosecution and the defendant." *Id.* (quoting *Barker*, 407 U.S. at 530). The burden is on the State to justify the length of the delay, and the defendant has the burden to prove assertion of the right and showing prejudice. *Id.* at 280.

## B. Discussion

### 1. Length of the Delay

The length of the delay is measured from the time the accused is arrested or formally accused. *Gonzales*, 435 S.W.3d at 809. Here, appellant was arrested on August 4, 2005 and the indictment was filed on November 16, 2005. Appellant's trial began on August 29, 2011. Thus, the delay was approximately six years. The State concedes that

the length of the delay was sufficient to trigger a *Barker* inquiry.  We agree.  *See Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) (holding that "in general, delay approaching one year is sufficient to trigger a speedy-trial inquiry").  We conclude that the delay was more than adequate to find presumptive prejudice and trigger a full *Barker* analysis.  *See Gonzales*, 435 S.W.3d at 809.

"When the length of delay stretches well beyond the bare minimum needed to trigger a full *Barker* analysis, the length of a delay weighs against the State, and the longer the delay, the more the defendant's prejudice is compounded."  *Id.* (citations omitted).  Here, the delay extended far beyond the minimum amount of time required to trigger a full *Barker* analysis, and as a result, this factor weighs heavily against the State.  *Id.*

### 2.  Reasons for the Delay

In analyzing the second factor—the reasons for the delay—we assign different weights to different reasons.  *Id.* (citing *Barker*, 407 U.S. at 531).  For instance, deliberate attempts to delay are weighed heavily, and more neutral reasons, while still considered, are weighed less heavily.  *Id.* (citing *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002)).  Thus, reasons that are unjustifiable count toward the length of delay, but justifiable reasons do not.  *Id.* at 810.  A valid reason, such as a missing witness, should serve to justify appropriate delay.  *Id.* at 809–10 (quoting *Zamorano*, 84 S.W.3d at 640).  Delay caused by an interlocutory appeal is ordinarily a valid reason that justifies delay.  *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).   The State bears the burden of establishing justifications for the unreasonable delay.  *Cantu*, 253 S.W.3d at 280; *Emery v. State*, 881 S.W.2d 702, 708 (Tex. Crim. App. 1994).

Appellant was arraigned on November 30, 2005.  The trial court set the case for announcements on January 13, 2006 and for trial on January 17, 2006.  On January 13,

2006, the State requested a continuance. The State advised the court that it was waiting for some "blood testing and possibly DNA testing" to be completed by the DPS lab in McAlllen, Texas.[1] Appellant's counsel stated he had "no objection" provided that, when the results were completed, he may need time to obtain an expert to evaluate the results. The trial court set the case for announcements and trial on March 20, 2006. On March 20, 2006, the State advised the trial court that it was still waiting for the DNA results. Appellant's counsel stated that he was "trying to be cooperative," but asked that the State "light a fire under them and get this in." Counsel noted that, "[o]ne way or another it will be dispositive of this case." The trial court set the case for announcements on April 7, 2006 and for trial on April 10, 2006. On April 7, 2006, the State advised the trial court that it anticipated getting the DNA results "after May 20th." Defense counsel requested a bond reduction, but the trial court said it would "look at it later."

On June 2, 2006, defense counsel advised the court that there were "some complications with the DNA testing" and that samples had to be resubmitted to the DPS lab. Defense counsel stated, "And obviously, we feel that the DNA results would be dispositive or would be helpful to us, so we certainly need it." Counsel also requested a bond reduction for appellant, which the trial court denied. The trial court set the case for announcements on August 25, 2006 and for trial on August 28, 2006. On August 25, 2006, defense counsel informed the court that the parties were still awaiting the DNA results. Defense counsel stated that, "[w]e believe the DNA is necessary on our behalf

---

[1] Testimony at trial established that appellant's shoes and the clothing he was wearing when he was arrested were submitted for DNA testing. Some stains on appellant's shoes tested positive for blood, but it could not be determined whether it was human blood. There were no DNA results obtained from appellant's clothing.

because we believe it is exculpatory."[2]   The State advised the trial court that it had submitted a new blood sample and that the forensic pathologist would not be available until October 2006.   Pursuant to defense counsel's request, the trial court lowered appellant's bond from $100,000 to $50,000.   The trial court set the case for announcements and trial on October 30, 2006.   On November 17, 2006, the trial court was advised that the parties had still not received the DNA results.   The trial court reset the case for announcements on February 2, 2007 and for trial on February 5, 2007.

On February 5, 2007, defense counsel urged the trial court "to allow us to go to trial."   Defense counsel stated that appellant had been in custody for 567 days and that the delay was the State's fault because it "had a hard time with the DNA results getting back from the lab."   The State informed the trial court that the DNA results had been returned, but the State was requesting permission to depose the forensic pathologist who had performed the autopsy because she no longer lived in the State.   Defense counsel objected to the State's request to depose the pathologist.   The trial court instructed the State to find out if the pathologist was available the week of March 19, 2007 to testify. The court reset the case for March 19, 2007, informing the parties to be ready for March 19 because the case had "been hanging around for a long time."   The trial court stated that it did not want to entertain any more motions for a continuance.

On February 8, 2007, the trial court held a hearing on the State's motion to designate a forensic pathology expert.   The State informed the court that the forensic pathologist who performed the autopsy was unavailable for March 19, 2007, and it was requesting to designate another pathologist to testify at trial.   Over defense counsel's

---

[2] We note that only appellant's clothing was tested.  There was no possibility that either Salinas or Martinez would be implicated because none of their clothing was submitted for testing.

objection, the trial court granted the State's motion. The case remained reset for March 19, 2007.

On March 14, 2007, defense counsel filed a motion in which he requested that the trial court set aside the indictment for failure to provide appellant a speedy trial. The State filed a written motion for a continuance based on the unavailability of its eyewitness, Martinez. On March 19, 2007, the trial court held a hearing on the motions. The State argued that it should be granted a continuance because Martinez was scheduled to give birth by caesarean section and was therefore unavailable the week trial was scheduled. In support of his motion to dismiss on speedy trial grounds, defense counsel noted that appellant had been in custody 593 days. Counsel further argued that the delays were attributable to the State, and that the State could have engaged the services of a private laboratory to expedite obtaining the DNA results. Defense counsel also argued that while appellant was incarcerated, he had been involved in several assaults, which resulted in additional charges against him. The trial court denied appellant's motion to dismiss based on speedy trial grounds, but dismissed the case without prejudice because the State was not ready to proceed to trial. The State appealed the trial court's order of dismissal. This Court agreed with the State that the trial court lacked the authority to dismiss the case without the prosecutor's consent. *See State v. Berlanga*, No. 13-07-226-CR, slip op. at 3 (Tex. App.—Corpus Christi Aug. 13, 2009) (mem. op., not designated for publication). Accordingly, we reversed the trial court's order of dismissal and remanded the case to the trial court for further proceedings. *See id.* After our mandate issued on November 20, 2009, the trial court reinstated the case, and on January 29, 2010, reset the case for trial on February 22, 2010.

14

On February 22, 2010, defense counsel asked the trial court to consider setting a low bond for appellant. The trial court took the request under advisement. On April 22, 2010, defense counsel asked for clarification as to whether the State had received the DNA results. The trial court reset the case for August 16, 2010 for announcements and for trial on August 30, 2010. On August 30, 2010, the trial court was advised that the State was procuring a search warrant to obtain hair samples from appellant for comparison to existing DNA evidence in the case. The parties estimated the process to take about two months. The trial court reset the case for October 28, 2010.

On October 28, 2010, the State announced that it had not received the results on comparing appellant's DNA samples to evidence collected from the crime scene. The trial court reset the case for announcements on December 2, 2010 and trial on December 6, 2010. Defense counsel advised the trial court that the bond company had surrendered appellant's bond and that he was back in custody as of August 2010. The trial court set a hearing for November 2, 2010 for the bond company to show cause as to why the bond had been surrendered.

On November 2, 2010, the trial court held a show cause hearing. Rafael Mata, owner of the bond company, testified that appellant had not been personally calling in every Monday morning, as he had been instructed to do. Appellant testified that he did call in every Monday. The trial court reinstated the bond and set a condition that appellant report every Monday in person to Mata.

On December 2, 2010, the State asked for an oral motion for continuance on both cases (the aggravated assault and murder cases) pending against appellant. Defense counsel stated that appellant was on bond and that he did not "have a problem with" the State's request for a continuance. The trial court reset both cases for announcements on

15

February 10, 2011 and trial on February 14, 2010.  The trial court stated that "[t]here will be no further continuances" on the cases.

On January 13, 2011, the trial court held a hearing to clarify which case would proceed first, the aggravated assault case or the murder case.  The prosecutor stated that the lab report in the murder case came in "over the holidays," but the State requested to go forward with the aggravated assault case first.  The trial court agreed.

On April 28, 2011, the State requested that the present case be reset for August 2011 because of scheduling conflicts.  Defense counsel stated that August "works for [him]."  The case was reset for pretrial matters on August 11, 2011 and for trial on August 22, 2011.  On August 18, 2011, the State requested a three-week continuance because it had been unable to locate Martinez, its key eyewitness.  Defense counsel stated he was "adamantly opposed" to a continuance and complained that the State had received numerous continuances as "close to six years have gone by."  The trial court reset the case for September 26, 2011, and noted that if the State was not ready on that date, the court would entertain a motion to dismiss.

On August 25, 2011, defense counsel filed a second motion to set aside the indictment on speedy trial grounds.  In the motion, counsel argued that appellant's defense had been prejudiced because he was unable to locate two witnesses whose testimony was "critical":  Jacob Perez, who could have impeached Salinas's testimony, and Ricardo Alvear, who was standing outside Salas's trailer and would have seen persons exiting the trailer.  The trial court heard appellant's motion at the pre-trial hearing on August 29, 2011.  The State responded that approximately two and a half years of the delay was attributable to the State's appeal of the trial court's earlier dismissal of the case. The State further argued that much of the remaining delay was attributable to the failure

16

of the crime lab to timely return the DNA results. The State also argued that appellant had failed to timely assert his right to a speedy trial. The trial court denied appellant's motion on speedy-trial grounds. A jury panel was chosen on August 29, and appellant's trial began the following day, August 30, 2011.

In this case, it is undisputed that the almost six-year delay was attributable entirely to the State. Although appellant acquiesced in many of the delays, he did not at any time request a continuance. The State requested, and was granted, at least thirteen continuances. More than two and a half years of the delay—from March 19, 2007 to November 20, 2009—is attributable to the State's appeal of the dismissal of the case, and is a valid reason that justifies delay. *See Loud Hawk*, 474 U.S. at 315. Less than two weeks of the delay—from August 18, 2011 to August 29, 2011—is attributable to the State's temporary failure to locate Martinez, its only eyewitness. We conclude that this was a valid reason that justified this portion of the delay. *See Gonzales*, 435 S.W.3d at 809–10.

The remainder of the delay—approximately three years—is attributable solely to the State's failure to timely obtain DNA-testing results on the submitted items. The record is silent as to any reasons for the lengthy delay. It does not appear that the State delayed unreasonably in sending the items to the lab for testing. Although the record is unclear as to when the items were sent, the State first requested a continuance based on waiting for the test results on January 13, 2006, approximately five and a half months after appellant was arrested and about six weeks after his arraignment. By June 2006, the record reflects there were complications and new samples were submitted. By February 2007, the long-awaited test results had been received, but the pathologist who had performed the autopsy was unavailable, and another pathologist was designated as the

State's expert. After the case was dismissed and on appeal, reversed and remanded, it appears that the State submitted new DNA samples from appellant for testing.[3]

Nonetheless, a reasonable period of time in which to develop its case is not held against the State. *See Shaw*, 117 S.W.3d at 889–90 (noting that the three–month interval between appellant's indictment and first trial may not be counted against the State, since the State was entitled to a reasonable period in which to prepare its case). Even if we find the delay in the present case to be unreasonable, in the absence of an explanation, the trial court cannot presume either a deliberate delay by the State in order to prejudice the defendant or a valid reason for the delay. *Huff v. State*, 467 S.W.3d 11, 29 (Tex. App.—San Antonio 2015, pet. filed) (citing *Shaw*, 117 S.W.3d at 889; *Dragoo v. State,* 96 S.W.3d 308,314 (Tex. Crim. App. 2003)). We conclude that the lengthy delay attributable to waiting for the DNA test results weighs against the State, but not heavily. *See id.*

### 3. Assertion of the Right

The third factor, the timing of appellant's assertion of his right to a speedy trial, evaluates whether he actually wanted a speedy trial. *See Cantu*, 253 S.W.3d at 283. An assertion of a speedy trial right is given great evidentiary weight to determine deprivation of that right. *See Gonzales*, 453 S.W.3d at 810–11; *Zamorano*, 84 S.W.3d at 651. An individual must assert a speedy-trial claim before the trial court in order to preserve the issue for appellate review. *Henson v. State*, 407 S.W.3d 764, 766 (Tex. Crim. App. 2013). "Filing for a dismissal instead of a speedy trial will generally weaken a speedy-trial claim because it shows a desire to have no trial instead of a speedy one." *Cantu*, 253 S.W.3d at 283. Moreover, as a detention becomes lengthier, the likelihood increases that

---

[3] The record is silent as to the State's theory or rationale for this testing.

someone who actually desired a speedy trial would have actively sought to obtain one. *Shaw*, 117 S.W.3d at 890.

Here, defense counsel first urged the trial court "to allow us to go to trial" on February 5, 2007, approximately eighteen months after appellant's arrest. A month later, on March 14, 2007, defense counsel filed a motion to set aside the indictment on speedy trial grounds. The trial court denied the motion, but dismissed the case without prejudice. Upon remand, defense counsel did not file a second motion to set aside the indictment on speedy trial grounds until August 25, 2011, a few days before trial began on August 30, 2011.

In *Shaw*, the court of criminal appeals found that the appellant "quietly acquiesced" to a "lengthy delay" when he failed to assert his speedy trial right until 29 months after his first trial ended in a hung jury. 117 S.W.3d at 890. The *Shaw* court found that the assertion-of-a-right factor weighed very heavily against finding a violation of a right to a speedy trial. *Id.; see also Kelly*, 163 S.W.3d at 729 (finding assertion-of-right factor did not weigh in defendant's favor when defendant waited over a year to file a motion to dismiss based on failure to receive a speedy trial, made assertion only once, and trial occurred within two months of motion being filed); *see also Jackson v. State*, No. 05-14-00283-CR, 2015 WL 1540800, at *4 (Tex. App.—Dallas April 1, 2015, no pet.) (mem. op., not designated for publication) (finding assertion-of-right factor weighed against appellant where she first filed a motion to dismiss eighteen months after she was arrested). Because appellant waited eighteen months to orally assert a desire to go to trial, and both written motions sought dismissal rather than a speedy trial, we conclude this factor weighs heavily against appellant. *See Cantu*, 253 S.W.3d at 283–84.

### 4. Prejudice

19

The fourth and final *Barker* factor focuses on the prejudice, if any, suffered by the defendant as a result of the delay. *Barker*, 407 U.S. at 532. The right to a speedy trial is designed to prevent oppressive pretrial incarceration, minimize the accused's concern and anxiety, and, most importantly, limit the possibility that the defense will be impaired. *See Gonzales*, 435 S.W.3d at 812 (citing *Barker*, 407 U.S. at 532).

In *Gonzales*, the court of criminal appeals considered whether a defendant's right to a speedy trial was violated after a six-year delay caused by the State's negligence in failing to pursue the defendant. *Gonzales*, 435 S.W.3d at 812–15. The *Gonzales* Court noted that a defendant is relieved of his burden to demonstrate prejudice if the length of delay is so excessive that it "presumptively compromises" the reliability of a trial in unidentifiable ways. *Id.* at 812. The court further noted that "[w]hen a defendant has timely asserted his right to a speedy trial [as the defendant had done in *Gonzales*], it is a difficult task for the State to prove that the defendant acquiesced in the delay." *Id.* at 815. The court found that the State had presented no record evidence showing that the defendant had acquiesced in the six-year delay. *Id.* Thus, the court of criminal appeals concluded that the State had "failed to vitiate the presumption of prejudice by proving that [a]ppellant acquiesced to the delay." *Id.* at 815.

The delay in the present case is comparable to the delay in *Gonzales*. *See id.* at 809. In *Gonzales*, however, the defendant timely asserted his right to a speedy trial and did not acquiesce in the delay. *See id.* at 815. ("When a defendant has timely asserted his right to a speedy trial, it is a difficult task for the State to prove that the defendant acquiesced in the delay.") Because the delay in the present case was presumptively prejudicial, as in *Gonzales*, the question before us is whether the State has rebutted the presumption of prejudice by demonstrating that the appellant acquiesced in the delay.

20

*See id*; *see also State v. Wei*, 447 S.W.3d 549, 557 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("Absent a showing that appellee acquiesced in the delay, it was the State's burden to rebut the presumption of prejudice because appellee was 'absolved from the requirement to demonstrate prejudice.'") (quoting *Gonzales*, 435 S.W.3d at 812).

Unlike the defendant in *Gonzales*, appellant did not timely assert his right to a speedy trial.[4] On at least three occasions, as late as August 25, 2006, defense counsel acquiesced in waiting for the DNA test results because he believed they would be "dispositive" and "exculpatory." We conclude that the State rebutted the presumption of prejudice by showing that appellant acquiesced in the delay. *See Gonzales*, 435 S.W.3d at 815; *see also Aranda v. State*, No. 04-14-00787-CR, 2016 WL 1043102, at * 5 (Tex. App.—San Antonio March 16, 2016, pet. filed) (mem. op., not designated for publication) (finding five-year delay was presumptively prejudicial, but presumption was extenuated by the defendant's acquiescence in the delay); *Pineda v. State*, Nos. 05-14-00632-CR & 05-14-00633-CR, 2015 WL 4462357, at * 7 (Tex. App.—Dallas July 21, 2015, no pet.) (mem. op., not designated for publication) (finding five-year delay presumptively prejudicial, but State demonstrated defendant's acquiescence to the delay and persuasively rebutted the presumption of prejudice). The fourth *Barker* factor weighs against the conclusion that appellant's right to a speedy trial was violated.

### 5. Balancing Test

Finally, having addressed the four *Barker* factors, it is necessary to balance them. Weighing in favor of finding a violation of appellant's right to a speedy trial is the extensive length of the delay. Although the entire delay was attributable to the State, we found that

---

[4] The defendant in Gonzalez filed a speedy-trial motion about a month after he was arrested. *See Gonzalez v. State*, 435 S.W.3d 801, 811 (Tex. Crim. App. 2014).

some of the delay was justified by valid reasons, such as the time the case was on appeal and the unavailability of a witness. As to the lengthy delay waiting for DNA testing results, we found that appellant acquiesced in much of the delay. We found the second factor to weigh against the State, but not heavily. The third and fourth factors weigh in favor of the State. Appellant waited nineteen months before filing his first motion, and when he did so, requested a dismissal rather than a speedy trial. Finally, the State rebutted the presumption of prejudice by showing that appellant acquiesced in the delay. We hold that the weight of the four factors, when balanced together, militates against finding a violation of appellant's right to a speedy trial. Accordingly, we conclude that appellant's right to a speedy trial was not violated, and the trial court did not err in denying the motion to dismiss.

## IV. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of June, 2016.

22